Oleg Elkhunovich (269238)
oelkhunovich@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Stephen Shackelford, Jr. (*pro hac vice* forthcoming)
Steven M. Shepard (admitted *pro hac vice*)
Amy B. Gregory (admitted *pro hac vice*)
Shauli Bar-On (356650)
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sshackelford@susmangodfrey.com
sshepard@susmangodfrey.com
agregory@susmangodfrey.com
sbar-on@susmangodfrey.com

*Attorneys for Relator Verity Investigations, LLC*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* VERITY INVESTIGATIONS, LLC<br><br>   *Plaintiff Relator*,<br>vs.<br><br>E&B NATURAL RESOURCES MANAGEMENT CORPORATION<br><br>   *Defendant*. | Case No. 1:24-cv-00928-CDB<br><br>**OPPOSITION TO MOTION TO DISMISS**<br><br>**Date: July 6, 2026**<br>**Time: 10:30 AM PT**<br>**Location: Courtroom 200**<br>**Judge: Magistrate Judge Christopher D. Baker** |

**TABLE OF CONENTS**

I.    Introduction ..................................................................................................... 1

II.   Background ...................................................................................................... 2

    A.   About Verity ............................................................................................ 2

    B.   About The Second Draw PPP Loan Program ......................................... 2

    C.   How Verity Detected E&B's Fraud ........................................................ 3

    D.   Verity's Claims ....................................................................................... 4

III.  Legal Standard ................................................................................................ 4

IV.   Argument ......................................................................................................... 5

    A.   E&B Has Not Carried Its Burden on the Public Disclosure Bar Affirmative Defense ........................................................................................................ 5

        1.   Legal Standard: E&B Bears the Burden ......................................... 5

        2.   Verity's Sources of Information Do Not Qualify for Any of the Three "Public Disclosure" Channels Specified in the FCA ........................ 5

            a.   The Forms 5500 Are Not "Federal Reports" ................................. 6

            b.   The PRAC's Online Database of PPP Loan Information Is Not a "Federal Report." ............................................................................ 9

            c.   The Forms 5500 and PandemicOversight.gov Are Not "News Media" .................................................................................. 11

            d.   The Galesi Group's Website Is Not "the News Media" ................ 12

        3.   Even If Any of Verity's Sources Qualified As a "Public Disclosure," the Bar Does Not Apply Because Those Sources Do Not Disclose "Substantially Similar … Transactions" ............................. 13

            a.   Legal Standard ............................................................................ 13

            b.   The Information Contained in Any Sources Does Not Permit a "Reasonable Inference of Fraud" ............................................... 14

        4.   Verity Is an Original Source ......................................................... 16

    B.   The FAC States a Plausible False Claims Act Violation Under Both Rule 8 and Rule 9(b) ....................................................................................... 18

        1.   The FAC Pleads Falsity with the Particularity Rule 9(b) Requires ........... 18

        2.   Two Independent Categories of Allegations Adequately Plead that E&B's 257-Employee Certification Was False ...................................... 19

            a.   Allegations Regarding the E&B 401(k) Plan's Forms 5500—Showing 300+ Active Participants—Adequately Plead Falsity ............................................................................................ 19

            b.   Allegations Regarding E&B's Affiliates' PPP Applications—Showing Hundreds More Employees—Adequately Plead Falsity ............................................................................................ 20

        3.   The FAC Adequately Pleads that E&B Acted with Requisite Scienter ............................................................................................ 22

C.    The FAC Pleads a Distinct Reverse FCA Claim Based on E&B's Post-Loan Concealment and Knowing Retention of Funds ........................................... 24

V.    Conclusion ...................................................................................................................... 25

OPPOSITION TO MOTION TO DISMISS

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*United States ex rel. Beck v. St. Joseph Health System*,
  2021 WL 7084164 (N.D. Tex. Nov. 30, 2021) ................................................................. 10, 12

*United States ex rel. Burke v. St. Jude Med., Inc.*,
  2021 WL 6135202 (D. Md. Dec. 29, 2021) .......................................................... 12

*United States ex rel. Campie v. Gilead Scis., Inc.*,
  862 F.3d 890 (9th Cir. 2017)............................................................................. 18

*United States ex rel. Hendow v. Univ. of Phoenix*,
  461 F.3d 1166 (9th Cir. 2006)........................................................................... 18

*United States ex rel. Hong v. Newport Sensors, Inc.*,
  2016 WL 8929246 (C.D. Cal. May 19, 2016) ........................................................ 12

*United States ex rel. Hong v. Newport Sensors, Inc.*,
  728 F. App'x 660 (9th Cir. 2018) ....................................................................... 12

*United States ex rel. Integra Med Analytics, LLC v. Creative Sols. in Healthcare, Inc.*,
  2019 WL 5970283 (W.D. Tex. Nov. 13, 2019) ........................................................ 17

*United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*,
  2019 WL 3282619 (C.D. Cal. July 16, 2019) (Gutierrez, J.), *rev'd and remanded on other grounds*, 854 F. App'x 840 (9th Cir. 2021)...................................... 11, 12

*Larsen v. Trader Joe's Co.*,
  917 F. Supp. 2d 1019 (N.D. Cal. 2013) ................................................................. 4

*United States ex rel. Louderback v. Sunovion Pharms., Inc.*,
  703 F. Supp. 3d 961 (D. Minn. 2023) ............................................................ 11, 13

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008)............................................................................. 4

*United States ex rel. Mateski v. Raytheon Co.*,
  816 F.3d 565 (9th Cir. 2016)............................................................. 5, 11, 13, 14

*United States ex rel. MC2 Sabtech Holdings, Inc. v. GET Eng'g Corp.*,
  580 F. Supp. 3d 876 (S.D. Cal. 2022) ................................................................. 11

*United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*,
  812 F.3d 294 (3d Cir. 2016).................................................................... 5, 16, 17

*Moore v. Kayport Package Exp., Inc.*,
    885 F.2d 531 (9th Cir. 1989).................................................................................. 18, 22

*United States ex. rel. Nevadans Against Fraud on the Gov't, LLC v. Terrible Herbst*,
    2026 WL 608897 (D. Nev. Mar. 4, 2026)................................................................ 11

*United States ex rel. Relator, LLC v. Kootstra*,
    2024 WL 3666470 (E.D. Cal. Aug. 6, 2024) .................................................. 9, 10, 16

*United States ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.*,
    739 F. Supp. 2d 396 (S.D.N.Y. 2010)...................................................................... 11

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
    563 U.S. 401 (2011) .................................................................................................. 8

*Silbersher v. Valeant Pharms. Int'l, Inc.*,
    89 F.4th 1154 (9th Cir. 2024)........................................................................... *passim*

*United States ex rel. Silingo v. WellPoint, Inc.*,
    904 F.3d 667 (9th Cir. 2018)................................................................................... 22

*United States ex rel. Sorgi v. Jazz Pharms. PLC*,
    802 F. Supp. 3d 49 (D. Mass. 2025) .............................................................. 7, 8, 17

*Starr v. Baca*,
    652 F.3d 1202 (9th Cir. 2011)................................................................................. 20

*United States ex rel. Thomas v. Siemens AG*,
    708 F. Supp. 2d 505 (E.D. Pa. 2010) ..................................................................... 25

*Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii*
    LLC, 512 F. Supp. 3d 1096 (D. Haw. 2021).......................................................... 25

*United States ex rel. Turner v. Dynamic Med. Sys., LLC*,
    2022 WL 20804350 (E.D. Cal. Jan. 24, 2022)......................................................... 5

*United States v. Allergan, Inc.*,
    46 F.4th 991 (9th Cir. 2022).............................................................................. 7, 10

*United States v. Associated Foreign Exchange Inc.*,
    2026 WL 790778 (C.D. Cal. Mar. 13, 2026) ......................................................... 21

*United States v. Baxter*,
    2025 WL 1343076 (N.D. Cal. May 8, 2025) .......................................................... 15

*United States v. Bourseau*,
    531 F.3d 1159 (9th Cir. 2008)................................................................................. 23

OPPOSITION TO MOTION TO DISMISS

*United States v. Kellog*,
2024 WL 4887531 (S.D. Cal. Nov. 25, 2024) .............................................................. 9, 10, 16

*United States v. Kinetic Concepts, Inc.*,
2017 WL 2713730 (C.D. Cal. Mar. 6, 2017) ...................................................................... 25

*United States v. Mariner Health Care, Inc.*,
552 F. Supp. 3d 938 (N.D. Cal. 2021) ............................................................................... 24

*Adomitis ex rel. United States v. San Bernardino Mountains Community Hospital District*,
816 F. App'x 64 (9th Cir. 2020) ................................................................................... 23, 24

*United States v. Uhler*,
2025 WL 4350115 (C.D. Cal. Oct. 6, 2025) ............................................................ 15, 19, 22

*United States v. United Healthcare Ins. Co.*,
848 F.3d 1161 (9th Cir. 2016).......................................................................................... 18, 19

*United States v. Valley Campus Pharmacy, Inc.*,
2021 WL 4816648 (C.D. Cal. June 23, 2021) .................................................................. 12, 13

**Statutes**

15 U.S.C. § 636(a)(37)(A)(iv)............................................................................................... 2

26 U.S.C. § 414(b)–(c) ........................................................................................................ 14

31 U.S.C. § 3729(a)(1)(A)–(B) ......................................................................................... 4, 18

31 U.S.C. § 3729(a)(1)(G) ................................................................................................ 4, 24

31 U.S.C. § 3729(b)(1)........................................................................................................ 22

31 U.S.C. § 3729(b)(3)........................................................................................................ 24

31 U.S.C. § 3730(e)(4)(A)(iii) ............................................................................................ 11

31 U.S.C. § 3730(e)(4)(A) ................................................................................................... 5

31 U.S.C. § 3730(e)(4)(B).................................................................................................... 16

134 Stat. § 10501(d)(2) ....................................................................................................... 10

134 Stat. § 10501(g)(1)(A)................................................................................................... 10

134 Stat. § 10501(g)(3)(A)(i)............................................................................................... 10

134 Stat. § 15010(g)(1)(A)................................................................................................ 9, 10

OPPOSITION TO MOTION TO DISMISS

**Rules**

13 C.F.R. § 121.301(f) ................................................................................................ 2, 17, 23

13 C.F.R. § 121.301(f)(1) ................................................................................................ 14, 21

13 C.F.R. § 121.301(f)(1), (3) ................................................................................................ 2

13 C.F.R. § 121.301(f)(3) ................................................................................................ 15

13 C.F.R. § 121.301(f)(6) ................................................................................................ 2

Fed. R. Civ. P. 8 ................................................................................................ 1, 18

Fed. R. Civ. P 9(b) ................................................................................................ 18, 19, 20, 22

Fed. R. Civ. P 12(b)(6) ................................................................................................ 4

**Other Authorities**

CARES Act, Pub. L. 116-136 § 15010(b), 134 Stat. 281, 534 (Mar. 27, 2020) ............................ 9

Consolidated Appropriations Act ................................................................................................ 2

False Claims Act ................................................................................................ 10, 12, 18

FOIA ................................................................................................ 8

## I.      Introduction

E&B Natural Resources Management Corporation's ("E&B's") motion to dismiss, ECF No. 40 ("Mot."), the First Amended Complaint, ECF No. 30 ("FAC"), should be denied. E&B defrauded the federal government out of over $2 million in taxpayer funds by certifying to the Small Business Administration ("SBA") that E&B was a "small business," a term the SBA defined to mean a company with fewer than 300 employees across all its "affiliates." The term "affiliate" was also carefully defined by SBA in regulations and a prominent, publicly available FAQ document on the SBA website. E&B knowingly lied to the SBA when it represented in its loan application that it and its affiliates together had just 257 employees.

The public disclosure bar does not apply. E&B wrongly and repeatedly asserts that any "publicly available information" qualifies as a "public disclosure." The Ninth Circuit has repeatedly held that this is not what the statute says. The statute identifies just three narrow "channels" that count as "public disclosures" for purposes of the bar. And E&B has not identified *any* disclosure that comes within the scope of *any* of those channels—let alone one that would give rise to a reasonable inference of fraud. Even if E&B *had* shown such a disclosure, the bar would still be inapplicable because Verity Investigations LLC's ("Verity's") independent work in "connecting the dots" qualifies Verity as an "original source."

Verity's complaint more than satisfies the pleading standards of Rule 8 and Rule 9(b). The FAC identifies the false statement (257 employees), the specific form (SBA Form 2483-SD), the time period (2021), and two categories of evidence showing falsity: (1) the E&B 401(k) Plan's own Forms 5500 submitted to the Department of Labor showing 356–435 plan participants; and (2) E&B's affiliates' Paycheck Protection Program ("PPP") applications reporting hundreds of additional employees. As for scienter, Verity's proposed Second Amended Complaint, ECF No. 50-2 ("SAC"), adds further allegations explaining why the Forms 5500 catch E&B in a lie.

Verity's "reverse" false claim cause of action is not duplicative. It targets E&B's distinct post-loan-application conduct: participating in the forgiveness process, submitting a Forgiveness Application while knowing of its ineligibility, and retaining over $2 million for more than four years without repaying a dime.

**II.    Background**

**A.    About Verity**

Verity is an investigative firm with extensive experience in detecting and reporting fraud on the U.S. public fisc. FAC ¶ 7. The undersigned counsel represent Verity in nearly all of Verity's lawsuits. In approximately thirty other cases, the Government has intervened in Verity's complaints against other defendants and obtained settlements that now exceed $53 million.

Verity detected E&B's fraud by cross-referencing E&B's PPP loan application data against multiple sources—including Forms 5500 that the E&B 401(k) Plan filed with the Department of Labor, E&B's affiliates' PPP loan applications, and E&B's parent's website—and synthesizing this information to reveal the falsity of E&B's certification.

**B.    About The Second Draw PPP Loan Program**

In March 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which authorized the PPP to provide emergency relief to small businesses affected by the pandemic. FAC ¶ 2. In December 2020, Congress enacted the Consolidated Appropriations Act, which created the "Second Draw" PPP loan program for businesses that had already received and used a First Draw loan. FAC ¶¶ 3, 30. Eligibility for Second Draw loans was limited to businesses with 300 or fewer employees, including affiliates. FAC ¶¶ 4, 30; 15 U.S.C. § 636(a)(37)(A)(iv).

The SBA published clear rules and extensive FAQs on its website explaining the meaning of "affiliate." The SBA's FAQ document told borrowers in no uncertain terms that they are "required to apply SBA's affiliation rules under 13 C.F.R. 121.301(f)" when certifying their number of employees. FAC ¶ 34. That longstanding regulation required applicants, when counting employees, to include the employees of "all of its domestic and foreign affiliates." 13 C.F.R. § 121.301(f)(6) (effective March 27, 2020 to September 7, 2021); FAC ¶ 35. The regulations defined "affiliate" to include affiliation based on ownership (where an individual or entity owns or has the power to control more than 50% of the concern's voting equity) and affiliation based on management (where the CEO or President of one concern also controls another), among others. 13 C.F.R. § 121.301(f)(1), (3) (effective March 27, 2020 to September 7, 2021); FAC ¶¶ 36, 38. These affiliation rules were not hidden in fine print—they were prominently explained in the SBA's

OPPOSITION TO MOTION TO DISMISS

publicly available FAQ, which unambiguously stated that "[i]t is the responsibility of the borrower to determine which entities (if any) are its affiliates." FAC ¶ 42.

To apply for a Second Draw PPP loan, borrowers were required to submit SBA Form 2483-SD. FAC ¶ 41; Exhibit A.[1] The form required the applicant to fill in a box containing its "Number of Employees (including affiliates, if applicable)." FAC ¶ 45; Exhibit A. The form also required the applicant's authorized representative to certify that they "read" and "understand" the Second Draw PPP loan application instructions and "the rules in effect at the time this application is submitted." FAC ¶ 44; Exhibit A. It then required the applicant's representative to certify that "[t]he Applicant, together with its affiliates (if applicable) … employs no more than 300 employees." FAC ¶ 46; Exhibit A.

### C.    How Verity Detected E&B's Fraud

Verity's detection of E&B's fraud required synthesizing multiple disparate data sources and applying knowledge of SBA's affiliation rules to reveal what no single public source disclosed: that E&B lied about its employee count.

In this case, Verity first obtained publicly available data regarding E&B's Second Draw PPP loan. That data revealed that E&B had applied for and received a $2 million Second Draw PPP loan, and that E&B had certified on its loan application that it and its affiliates together had just 257 employees. FAC ¶¶ 5, 62.

Verity then sourced the Department of Labor's public database to locate the E&B 401(k) Plan's Forms 5500. FAC ¶ 71. The Forms 5500 showed that the Plan had between 356 and 435 "active participants" in 2019 and 2020—exceeding the 300-employee threshold. FAC ¶¶ 72–74.

Verity next obtained the "Report of Independent Auditors," which stated that E&B's 401(k) plan covered "all employees of the Company and certain affiliated companies." SAC ¶ 80; ECF No. 41-3 at 29.

In addition, Verity investigated the Galesi Group's website, which identified E&B and other entities as its "affiliates" and stated that the Galesi Group owns E&B. FAC ¶¶ 52–55.

---

[1] SBA Form 2483-SD, revised January 8, 2021, is attached as Exhibit A to this Opposition and is available at https://home.treasury.gov/system/files/136/PPP-Second-Draw-Borrower-Application-Form-posted-01-08-2021.pdf.

OPPOSITION TO MOTION TO DISMISS

Verity used state government websites to identify the controllers of E&B affiliates, information that further confirms that those companies are affiliated with E&B under the SBA's affiliation rules. FAC ¶ 55.

Verity subsequently traced the PPP loan applications of E&B's affiliates. Those applications reported hundreds of additional employees. FAC ¶ 80. The FAC identifies three affiliates—Distribution Unlimited, Inc. (69 employees), Rotterdam Ventures, Inc. (58 employees), and Northeastern Industrial Park, Inc. (20 employees)—whose employees, combined with E&B's 257 reported employees, totaled 404 employees. FAC ¶¶ 80–81. The SAC identifies additional affiliates, including Excalibur Well Services Corporation, which reported 157 employees on its First Draw PPP loan application and 99 on its Second Draw loan application. SAC ¶¶ 57, 89–90.

By synthesizing these disparate data points and applying the affiliation rules, Verity found the evidence giving the lie to E&B's certification of having just 257 employees across all affiliates.

### D.    Verity's Claims

Verity brings this *qui tam* action on behalf of the United States. The FAC alleges that E&B violated 31 U.S.C. § 3729(a)(1)(A) and (B) by knowingly presenting a false claim for payment when it submitted its SBA Form 2483-SD falsely certifying that it and its affiliates had just 257 employees. FAC ¶¶ 84–94. In addition to the false certification claims, the FAC also alleges that E&B violated the reverse FCA provision, 31 U.S.C. § 3729(a)(1)(G), by knowingly and improperly avoiding its obligation to repay its Second Draw PPP loan—participating in the forgiveness process, submitting a Forgiveness Application while knowing of its ineligibility, and retaining over $2 million for more than four years. FAC ¶¶ 95–100. The SAC expands on these allegations by identifying E&B's contractual obligation to repay the loan and its statutory obligation to repay the "overpayment." SAC ¶¶ 106–110.

## III.    Legal Standard

On a Rule 12(b)(6) motion, a court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The "question presented is not whether the plaintiff will prevail in the action, but whether the plaintiff is entitled to offer evidence in support of the claim." *Larsen v. Trader Joe's Co.*, 917 F. Supp. 2d 1019, 1022 (N.D. Cal. 2013).

**IV.     Argument**

**A.     E&B Has Not Carried Its Burden on the Public Disclosure Bar Affirmative Defense**

**1.     Legal Standard: E&B Bears the Burden**

"The public disclosure bar is an affirmative defense under the … FCA" and "the burden of establishing an affirmative defense falls on defendants." *United States ex rel. Turner v. Dynamic Med. Sys., LLC*, 2022 WL 20804350, at *8 (E.D. Cal. Jan. 24, 2022). Because "affirmative defenses ordinarily may not be raised on a motion to dismiss," courts dismiss FCA claims on public disclosure grounds only "when there is some obvious bar to securing relief on the face of the complaint." *Id.* (internal quotation marks and citations omitted). E&B has not met that burden.

**2.     Verity's Sources of Information Do Not Qualify for Any of the Three "Public Disclosure" Channels Specified in the FCA**

Not everything on the Internet is a "public disclosure." Far from it. The "public disclosure" bar specifies three—and only three—channels that constitute "public disclosures." E&B's burden is to show that "substantially the same allegations or transactions" were "publicly disclosed—(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or (iii) from the news media." 31 U.S.C. § 3730(e)(4)(A). The bar applies only to disclosures that "occurred through one of [these three] channels specified in the statute." *United States ex rel. Mateski v. Raytheon Co.*, 816 F.3d 565, 570 (9th Cir. 2016).

E&B simply ignores this requirement when it repeatedly refers to "public information," without making any attempt to link that "public information" to the three specific channels set forth in the statute. Mot. at 7–9.

Congress last amended the public disclosure bar in 2010. *United States ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 298 (3d Cir. 2016) (emphasizing the textual changes). The text that Congress added "radically changed the 'hurdle' for relators." *Id.* "Although no direct legislative history seems to exist, the textual changes alone evince Congress's intent to lower the bar for relators, at least as to some of its components." *Id.* at 299.

### a.    The Forms 5500 Are Not "Federal Reports"

The lynchpins of Verity's complaint are the Forms 5500 filed by the E&B Natural Resources Management Corp. 401(k) Plan. Attached to each of those forms is an "auditor's report" prepared by an outside auditor, stating that the "active participants" in the plan were "employees of the Company [E&B] and certain affiliates." SAC ¶¶ 78–83. E&B simply asserts, without analysis, that these Forms 5500 count as "Federal reports," under channel (ii), because these documents "can be accessed from a federal government website" and are therefore "public information available for public inspection." Mot. at 8. That is not the test.

The canon of *noscitur a sociis*—a word is known by the company it keeps—indicates that the statutory term "other Federal report" must be read consistent with the other words in channel (ii): "a congressional, Government Accountability Office … report." Congressional and GAO reports are documents *created by* those federal entities.[2] It would not be appropriate to construe a constituent's letter to his Senator as a "congressional … report" simply because the Senator receives the letter. Likewise, a Form 5500 is not an "other Federal report" simply because it is received by the Department of Labor. A Form 5500 is a filing made by a private party, not a report made by the federal agency. And the document does not transmogrify into a "Federal report" simply because the Department of Labor makes it available online.

E&B cites no case holding that a Form 5500, or any similar disclosure *to* a federal agency, qualifies as a "Federal report" for purposes of the public disclosure bar. There is significant caselaw holding just the opposite. In *United States ex rel. Craig v. Hawthorne Machinery Co.*, the court denied a motion to dismiss another FCA case involving PPP fraud based on a fraudulent representation by the defendant about the number of its employees. 2024 WL 4294878, at *6 (S.D. Cal. Sept. 25, 2024). There, as here, the defendant invoked the public-disclosure bar and pointed out that its Form 5500 was "plainly a public source of information available to anyone on the internet." *Id.* at *12. But the district court denied the motion to dismiss based on the public disclosure bar nonetheless, finding that the Form 5500 was not sufficient to carry defendant's

---

[2] *See* U.S. Government Accountability Office, *Reports*, https://www.gao.gov/for-congress/reports ("GAO's reports give Congress timely, fact-based, non-partisan information that can improve government operations and save taxpayers billions of dollars.").

OPPOSITION TO MOTION TO DISMISS

burden on this affirmative defense. *Id.*

Similarly, in *United States v. Janssen Biotech*, the district court held that patent filings submitted to the Patent Trademark Office did not qualify as "Federal reports" even though they were received by that federal agency and then made available on the agency's website. 576 F. Supp. 3d 212, 225–26 (D.N.J. 2021). Indeed, as the *Janssen* court pointed out, the expansive interpretation of "Federal report" urged by the defendant in that case, and by E&B here, would "encompass" every non-sealed filing made in "every civil case published on the PACER electronic docket," regardless of whether the Government is a party, since every PACER filing is a document received by a federal court and then made available by the court online. *Id* at 226. That is "obviously" not what Congress intended. *Id.* Indeed, even one of the cases cited by E&B holds as much: filings made in an adversarial *inter partes review* proceeding, before the Patent Trial and Appeal Board (PTAB), are not "Federal reports," even though the filings are received and considered by the PTAB (a federal agency) when resolving the parties' dispute and are then made available on the PTAB's online docket. *United States ex rel. Sorgi v. Jazz Pharms. PLC*, 802 F. Supp. 3d 49, 61–62 (D. Mass. 2025).

In the *Allergan* and *Valeant* cases, the Ninth Circuit closely analyzed channel (ii) of the public-disclosure bar. In *Allergan*, the Ninth Circuit held that an *ex parte* patent examination, conducted by the federal Patent and Trademark Office, qualifies as an "other Federal … hearing" for purposes of channel (ii). *United States v. Allergan, Inc.*, 46 F.4th 991, 997–98 (9th Cir. 2022). The Ninth Circuit held that channel (ii) refers "to a fact-finding or investigatory process [by the federal agency] to *obtain* information." *Allergan, Inc.*, 46 F.4th 991, 998 (internal quotation marks omitted). "This conclusion is reinforced by the fact that prong (ii) begins with Congress and the Government Accountability Office, which often seek to obtain information by way of a hearing, audit, or investigation and issue those findings in a report." *Id.* Thus, an *ex parte* examination of the patent application, by the PTO, qualifies as a "Federal hearing." *Id.*

By contrast, the Ninth Circuit held two years later in *Valeant* that an *inter partes* review (IPR) proceeding, before the PTAB, does *not* qualify as a "Federal … hearing." *Silbersher v. Valeant Pharms. Int'l, Inc.*, 89 F.4th 1154, 1166 (9th Cir. 2024). Unlike an *ex parte* patent application process, an "IPR is a trial-like proceeding" in which "the person challenging the patent

OPPOSITION TO MOTION TO DISMISS

argues against the validity of the patent, and the patent owner defends it." *Id.* at 1160–61. In *Valeant*, the relator was the patent lawyer who had earlier filed (and won) an IPR proceeding against Valeant, obtaining a ruling from the PTAB that Valeant's patent was invalid as "obvious" based on studies written by Valeant's own head of research and published before Valeant applied for the patent. *Id.* at 1162. The relator then brought an FCA case, alleging that by not disclosing those studies to the PTO during the initial patent application, Valeant violated the FCA. *Id.* at 1162–63. The district court dismissed the FCA case, finding that the relator's submissions to the PTAB during the IPR were "public disclosures" under channel (ii) because the IPR was a "Federal hearing." *Id.* at 1163. But the Ninth Circuit reversed. The IPR did *not* qualify as a "Federal hearing" under channel (ii) because its "primary function was not investigative in the sense of conducting a 'fact-finding or investigatory process "to obtain information."'" *Id.* at 1166 (quoting *Allergan*, 46 F.4th at 998). Therefore, "the disclosures in the IPR proceeding at issue here did not constitute a disclosure occurring within a specified channel." *Id.* It follows *a fortiori* that the public *filings* made during an IPR proceeding are not "Federal reports" for purposes of channel (ii). *Accord Janssen*, 576 F. Supp. 3d at 226; *Jazz Pharms.*, 802 F. Supp. 3d at 61–62.

The only case that E&B cites, for the proposition that a Form 5500 counts as a "federal report," is *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 410 (2011). But in that case, the relevant document was a "written agency response to a FOIA request" created and then sent by the federal agency (the Department of Labor). *Id.* The Department actually *did work* to generate that document—as the Court's opinion emphasized in detail. *Id.* at 410–11. An agency's response to a FOIA request is "an "official or formal statement of facts" *from the agency*. *Id.* at 411. The agency's work was especially important in the *Schindler* case because the relator relied on the *absence* of official records to allege that defendant had failed to file the required "VETS-100 Reports." *Id.* at 406. That allegation was based on the agency's attestation, in its written FOIA response, that no records had been found. *Id.* (agency's response provided relator with "information about the records found for each year, *including years for which no responsive records were located*" (emphasis added)).

**b.  The PRAC's Online Database of PPP Loan Information Is Not a "Federal Report."**

E&B contends that "public PPP data … falls within the ambit of a 'report.'" Mot. at 8. It appears, from E&B's citation of the *Kootstra* and *Kellog* cases, that E&B is referring to the database of PPP loan information that was created by the Pandemic Response Accountability Committee ("PRAC") and made available online at PandemicOversight.gov. *See United States ex rel. Relator, LLC v. Kootstra*, 2024 WL 3666470, at *3–4 (E.D. Cal. Aug. 6, 2024) (discussing this website); *United States v. Kellog*, 2024 WL 4887531, at *3 (S.D. Cal. Nov. 25, 2024) (same).

It is true that PRAC did more, on PandemicOversight.gov, than simply make E&B's application form available (which is all that the Department of Labor did, with the Forms 5500). PRAC also did additional work: extracting relevant information from E&B's application; correlating that information with SBA data regarding the loan's forgiveness; and then creating a searchable online database containing that information.

Nevertheless, it would be a mistake to conclude that Congress intended the display of loan and forgiveness information on PandemicOversight.gov to count as a "federal report" for purposes of the FCA's public disclosure bar. The PRAC was not a typical federal agency. It was an *ad hoc* committee within the Council of the Inspectors General on Integrity and Efficiency, which Congress created in the same Act—the Coronavirus Aid, Relief, and Economic Security ("CARES") Act—in which Congress provided for the first draw of PPP loans. In creating the PRAC, Congress was keenly aware of the risk of PPP fraud. That is why Congress tasked PRAC with various tasks including "detect[ing] fraud."[3] It would defeat Congress's purpose if the PRAC's website were to *bar* Verity from using this website for that intended purpose.

The text of the CARES Act demonstrates that Congress did *not* consider the PRAC's website to be a "Federal report." The Act instructed PRAC to "establish and maintain a user-friendly, public-facing website to foster greater accountability and transparency in the use of covered funds."[4] Tellingly, although Congress specifically directed PRAC to prepare and publish

---

[3] CARES Act, Pub. L. 116-136 § 15010(b), 134 Stat. 281, 534 (Mar. 27, 2020) ("There is established within the Council [of the Inspectors General on Integrity and Efficiency] the Pandemic Response Accountability Committee to promote transparency and conduct and support oversight of covered funds and the Coronavirus response to—(1) prevent and detect fraud, waste, abuse, and mismanagement").
[4] *Id.* § 15010(g)(1)(A), 134 Stat. at 539.

various kinds of "reports,"[5] Congress did *not* use the word "report" in describing the website itself or the data made available on it. Congress instead used the words "information" and "data."[6]

The PandemicOversight.gov database does not qualify as a "Federal report" under the Ninth Circuit's analysis of channel (ii) in *Allergan* and *Valeant*. As discussed above, channel (ii) is limited to a "fact-finding or investigatory process [by the federal agency] to *obtain* information." *Allergan*, 46 F.4th at 998 (internal quotation marks omitted). Under that reading, a "report" is the document in which the federal agency "issue[s] those findings" it makes as a result of that process. *Id.* As just noted, PRAC was instructed to prepare those kinds of "reports." But the loan data displayed on PandemicOversight.com was *not* generated or received by PRAC in connection with any such "fact-finding or investigatory process," and certainly that loan data was not the *result* of any such process. The loan data was instead displayed on the website for an entirely different Congressional purpose, namely: "to foster greater accountability and transparency in the use of covered funds."[7]

The district courts in *Kootstra* and *Kellog* considered none of these arguments. In *Kootstra*, the relator simply did "not respond to Defendants' argument about the website being a 'federal report.'" 2024 WL 3666470, at *3. Given that forfeiture by relator, it's no surprise that Judge Nunley found, "absent any argument to the contrary," that PandemicOversight.gov "constitutes a 'federal report.'" *Id.* at *4.[8] The only authority cited in the *Kellog* case, for the proposition that PandemicOversight.gov is a "federal Report," is a New York district court decision that applied an obviously incorrect legal standard to the pre-2010 version of the statute. 2024 WL 4887531, at *3 (citing *United States ex rel. Rosner v. WB/Stellar IP Owner, L.L.C.*, 739 F. Supp. 2d 396, 405, 407

---

[5] For example, PRAC was directed to "submit biannual reports to the President and Congress," and to "post[]" those reports "on the website." *Id.* § 10501(d)(2), 134 Stat. at 536. PRAC was also directed to provide, on the website, "findings from Inspectors General, including any progress reports, audits, inspections, or other reports, including reports from or links to reports on the website of the Government Accountability Office." *Id.* § 10501(g)(3)(A)(i), 134 Stat. at 539. PRAC was also directed to provide "open format reports on covered funds obligated by month to each State and congressional district." *Id.* (g)(3)(A)(iv), 134 Stat. at 539.

[6] *Id.* § 10501(g)(3)(A)(iii) ("The website shall provide detailed data on any Federal Government awards that expend covered funds"); *id.* (A)(vi) ("The website shall include detailed information on Federal Government awards that expend covered funds").

[7] *Id.* § 10501(g)(1)(A), 134 Stat. at 539.

[8] E&B also cites *United States ex rel. Beck v. St. Joseph Health System*, but that case is similar to *Kellog*, because the relator in that case did "not appear to contest" whether the challenged sources "constitute public disclosures within the meaning of the False Claims Act." 2021 WL 7084164, at *3 n.9 (N.D. Tex. Nov. 30, 2021).

(S.D.N.Y. 2010)). *Rosner* erroneously held that "'public disclosure' occurs when the relevant information is 'placed in the public domain,'" 739 F. Supp. 2d at 404. *Rosner* is directly at odds with the Ninth Circuit's guidance that the bar applies only to those disclosures that "occurred through one of the [three] channels specified in the statute." *Mateski*, 816 F.3d at 570.

### c.    The Forms 5500 and PandemicOversight.gov Are Not "News Media"

Channel (iii) of the public disclosure bar refers to disclosures "from the news media." 31 U.S.C. § 3730(e)(4)(A)(iii). None of the sources of information, referred in E&B's opposition, qualifies as "the news media." There is no Ninth Circuit authority construing the term.

It is "clear as a matter of common sense" that the term "news media" "cannot encompass *all* online information." *United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*, 2019 WL 3282619, at *11 (C.D. Cal. July 16, 2019) (Gutierrez, J.), *rev'd and remanded on other grounds*, 854 F. App'x 840 (9th Cir. 2021). Judge Gutierrez's opinion provided five "guideposts" for determining whether online information qualifies as "news media": (1) whether the source conveys information commonly found in newspapers or other news sources; (2) whether it is a source that "curates information" and exercises "editorial judgment"; (3) whether there is intent to disseminate widely; (4) whether it functions like traditional news outlets; and (5) most importantly, whether it would "reasonably" be described as "news media" in "everyday speech." *Id.* at *14–15.

The Forms 5500 and the loan data on PandemicOversight.com flunk at least four of the five *Integra* factors. They do not convey the type of information commonly found in newspapers; they exercise no curating function; they do not function like "traditional news outlets," and no native English speaker would refer to either of them as "news media" in everyday speech. *Id.*

Following *Integra*, many other district courts—including at least three in this Circuit—have held that materials do not qualify as "news media" simply because they are posted online. *E.g.*, *United States ex. rel. Nevadans Against Fraud on the Gov't, LLC v. Terrible Herbst*, 2026 WL 608897, at *7 (D. Nev. Mar. 4, 2026) ("Bizapedia.com" and "secretary of state websites" are not "news media"); *United States ex rel. MC2 Sabtech Holdings, Inc. v. GET Eng'g Corp.*, 580 F. Supp. 3d 876, 890 (S.D. Cal. 2022) ("[N]either [defendant's] nor the California Secretary of State's website qualifies as 'news media[.]'"); *United States ex rel. Louderback v. Sunovion Pharms., Inc.*,

703 F. Supp. 3d 961, 975 (D. Minn. 2023) ("[T]he information disclosed on Sunovion's website … do[es] not fall within the 'news media' category[.]"); *United States v. Valley Campus Pharmacy, Inc.*, 2021 WL 4816648 (C.D. Cal. June 23, 2021) (Defendant's website is outside public disclosure channels because the "website simply publishes information about itself; it does not function like traditional news outlets; and most people would not consider a company's website to be the news media.") (internal quotation marks omitted); *United States ex rel. Burke v. St. Jude Med., Inc.*, 2021 WL 6135202, at *1, *5 (D. Md. Dec. 29, 2021) (holding "online medical device database" is not "news media").

Against all that authority, E&B cites just two district court opinions: *United States ex rel. Hong v. Newport Sensors, Inc.*, 2016 WL 8929246, at *5 (C.D. Cal. May 19, 2016) and *United States ex rel. Beck v. St. Joseph Health System*, 2021 WL 7084164, at *3 (N.D. Tex. Nov. 30, 2021). The Ninth Circuit expressly declined to adopt the *Hong*'s "broad holding that most public webpages … generally fall within the category of 'news media.'" *United States ex rel. Hong v. Newport Sensors, Inc.*, 728 F. App'x 660, 662–63 (9th Cir. 2018). And for good reason. As explained in *Integra*, *Hong* and similar district court decisions "did not undertake their own independent analysis of the meaning and scope of the news media provision" and did not even "attempt[] to define the ordinary meaning of the term 'news media' or to otherwise ground their interpretation in the statutory text." 2019 WL 3282619, at *13. The *Hong* district court's reasoning "is at odds with the Supreme Court's description of the public disclosure bar" and "improperly strays" from it. *Id.* E&B's second case, *Beck* (an out-of-circuit district court case), contained no meaningful analysis. 2021 WL 7084164, at *3. That is because the relator in that case did "not appear to contest" whether the challenged sources "constitute public disclosures within the meaning of the False Claims Act," so the court had no counterarguments before it to consider. *Id.* at *3 n.9.

### d.    The Galesi Group's Website Is Not "the News Media"

The Galesi Group's corporate website is not "the News Media" under the *Integra* factors. The Galesi Group's website is a standard corporate website that describes the Galesi Group's business operations and portfolio of companies. It does not convey the type of information commonly found in newspapers or other news outlets, exercise any curating or editorial function, or function like traditional news outlets.  Like the defendant's website in *Valley Campus Pharmacy*,

the Galesi Group's website "simply publishes information about itself"; "does not function like traditional news outlets"; and "most people would not consider a company's website to be the news media." 2021 WL 4816648, at *8. And like the defendant's website in *Louderback*, the Galesi Group's website primarily contains "customer-directed communications" rather than "information-gathering, editorial, and distribution activities." 703 F. Supp. 3d at 975–76.

        **3.**        **Even If Any of Verity's Sources Qualified As a "Public Disclosure," the Bar Does Not Apply Because Those Sources Do Not Disclose "Substantially Similar … Transactions"**

        **a.**        **Legal Standard**

Even if this Court were to find that *some* of the sources mentioned in the Motion come within the scope of channel (ii) or (iii), the Motion should still be denied. It is not sufficient for E&B to prove that the complaint is "*partly* based on" information in these channels. *Mateski*, 816 F.3d at 579 (emphasis added); *see also Valeant*, 89 F.4th at 1167 (the statutory phrase "based on" was deleted by Congress in 2010).[9] Rather, E&B's burden is to prove that "the qualifying disclosures reveal 'substantially the same … allegations or transactions' as in" Verity's action. *Valeant*, 89 F.4th at 1166 (quoting 31 U.S.C. § 3730(e)(4)(A)).

The term "allegation" means a prior "direct claim of fraud." *Id.* E&B does not even try to show that any public-disclosure channel contained a "direct claim of fraud."

The term "transaction" means "the disclosure of facts from which fraud can be inferred." *Id.* (internal quotation marks omitted). The inference must be more than speculation: the public disclosures must "permit a reasonable inference of fraud." *Id.* at 1167. "[S]cattered disclosures" are *not* sufficient even if, when "viewed together," they "possibly reveal some of [the] true … facts." *Id.* at 1168. Public disclosures at a "high level of generality" will not suffice to carry E&B's burden. *Mateski*, 816 F.3d at 575.

In *Valeant*, the scattered disclosures did not disclose a "transaction" because they did not indicate *scienter*, that is, a knowing false statement. 89 F.4th at 1168. The "conflicting positions" taken by that defendant, in its public statements to the PTO, was only revealed once the relator

---

[9] The *Mateski* panel distinguished other Circuit's "partly based on" formulations by explaining that in those cases, the "primary focus of [relator's] complaint," or "most of" the relator's "allegations," had been publicly disclosed in one of the three channels. 816 F.3d at 579–80.

pointed out that the prior studies had been authored by the defendant's own head of research. *Id.*

In *Mateski*, the public disclosures were even more detailed. Those public disclosures contained allegations of Raytheon's "general problems involving mismanagement, technical difficulties, and noncompliance with contract and policy directives." 816 F.3d at 579. The Ninth Circuit assumed (without deciding) that those "prior public reports provided enough information to pursue an investigation into *some* fraud," and the Ninth Circuit even noted that "the Government did in fact undertake some investigation." *Id.* at 579 (cleaned up). But the public disclosure bar still did not apply because that relator's complaint included "specific areas" that were not contained in the public disclosures. *Id.* The guidance from *Mateski* is that public disclosures at a "high level of generality" will not suffice to trigger the disclosure bar. *Id.* at 575.

### b. The Information Contained in Any Sources Does Not Permit a "Reasonable Inference of Fraud"

E&B recites the *Mateski* formula defining the term "transaction": "[I]f $X + Y = Z$, $Z$ represents the allegation of fraud and $X$ and $Y$ represent its essential elements. "In order to disclose [a] fraudulent transaction publicly, the combination of $X$ and $Y$ must be revealed." *Valeant*, 89 F.4th at 1167 (quoting *Mateski*, 816 F.3d at 571). But the formula in this case has many more inputs than just $X$ and $Y$. The formula in this case is more akin to:

$X$ [the loan application's statement that E&B and its affiliates had 257 employees]

*Plus*   $Y1$ [the truth that E&B was an "affiliate" of the Galesi Group]

*Plus*   $Y2$ [the truth that the E&B 401(k) Plan's Form 5500 counted, as "active participants," the employees of "certain affiliates"—as noted in the auditor's report]

*Plus*   $Y3$ [the total count of "active participants" in the plan was far more than 300]

*Plus*   $Y4$ [the Form 5500's identification of E&B as a "single employer" plan indicates that those other "certain affiliates" were under 80% common ownership[10]]

*Plus*   $Y5$ [the plan's administrator, who signed the Form 5500, was also the President of E&B]

---

[10]   This is proof of affiliation. Under IRS rules, a "single employer" plan means that the employers participating in the plan are under 80% common ownership. 26 U.S.C. § 414(b)–(c). The fact that E&B's plan was designated a "single employer" plan covering "certain affiliates," Exhibit A, indicates that those affiliates meet the SBA's broader affiliation rules, which require only 50% ownership, 13 C.F.R. § 121.301(f)(1).

OPPOSITION TO MOTION TO DISMISS

*Plus*    Y6 [other companies are "affiliated" with E&B because their controllers are the same[11]]

*Equals* Z [E&B lied to the SBA when it stated that it and its affiliates had just 257 employees]

Even if this Court were to conclude that PandemicOversight.gov is a "Federal report," that would only demonstrate that X [the loan application's statement] was publicly disclosed. And X, standing alone, is not a "transaction." And even if this Court were also to conclude that the Galesi Group's website is "news media," that would only mean that Y1 [E&B's affiliation with Galesi Group] was publicly disclosed. The combination of X + Y1 is still nowhere near enough to meet the Ninth Circuit's standard for what counts as a publicly disclosed "transaction." As noted above, the Ninth Circuit requires that the combination of publicly disclosed data points must "permit a reasonable inference of fraud." *Valeant*, 89 F.4th at 1167. "[S]cattered disclosures" are *not* sufficient even if, when "viewed together," they "possibly reveal some of [the] true … facts." *Id.*at 1168. The combination of X + Y1 does not give rise to any inference that E&B misstated the number of its and its affiliates' employees.[12]

At least three district courts have held exactly this when rejecting public-disclosure-bar defenses in PPP-loan fraud cases. *United States v. Baxter*, 2025 WL 1343076 (N.D. Cal. May 8, 2025) ("[T]he information available on PandemicOversight.gov provides no information from which the true state of facts can be inferred" but rather "was so innocuous that there was no public disclosure of a transaction or allegation of fraud[.]" (internal quotation marks omitted)); *Hawthorne*, 2024 WL 4294878, at *13 ("[I]t is not clear, at this stage, that the information in the Form 5500 (or any other public source) 'revealed' the 'combination' of the 'essential elements' of Defendants' alleged fraud"); *United States v. Uhler*, 2025 WL 4350115, at *6 (C.D. Cal. Oct. 6, 2025) (Defendant "has not demonstrated that the public disclosures of PPP loan data … revealed any *misrepresented* state of facts such as to constitute an inference of the alleged … fraud").

---

[11] This is also proof of affiliation. Under the then-operative SBA's affiliation rules, companies were affiliated if they shared common management. 13 C.F.R. § 121.301(f)(3) (effective March 27, 2020 to September 7, 2021).

[12] The Galesi Group's website stated that the Group employed 150 employees. FAC ¶ 53 (citing https://www.galesi.com/history-overview/). But the website did not state the number of E&B's employees, nor did it disclose the total employee count across all Galesi Group affiliates. So X + Y1 together do not support any inference of fraud.

OPPOSITION TO MOTION TO DISMISS

In *Valeant*, as here, the inference of scienter was missing from the information contained in the three statutory channels. 89 F.4th at 1168. Only once the relator connected the dots (using the same information disclosed in the non-channel IPR proceeding) did that relator have an allegation of a "conflicted position" taken by that defendant. So too, here. The Forms 5500 (which are not a channel disclosure) were signed by E&B's *President*, acting as administrator of E&B's plan; he attested in the Forms 5500 that the plan had more than 300 "active participants." The *auditor's report* attached to that Form 5500 explains that "active participants" means the employees of E&B and "certain affiliate companies." ECF No. 41-3 at 29. And it is only Relator's complaint (and Relator's knowledge of the IRS rules governing 401(k) plans) that explains how the Form 5500's identification of this plan, as a "single-employer" plan, indicates that each of these "certain affiliated companies" is under 80% common ownership with E&B. The President's signature on these Forms is a clear example of a "conflicting position" taken by E&B's leadership.

E&B's reliance on *Kootstra* and *Kellog* is misplaced because in those cases, a single public disclosure source directly revealed the entire fraudulent transaction. In *Kootstra*, the SBA loan data identified the defendant as a "mortgage lender," and mortgage lenders were categorically ineligible for PPP loans. 2024 WL 3666470, at *4. Both the "X" (defendant claimed eligibility) and the "Y" (defendant was a mortgage lender and therefore ineligible) were disclosed on PandemicOversight.gov. Similarly, in *Kellog*, a single public news article contained *all* the information necessary to reveal the country club's fraudulent PPP loan procurement. 2024 WL 4887531, at *3.

### 4.    Verity Is an Original Source

Even if the public disclosure bar applied, Verity satisfies the "original source" exception. 31 U.S.C. § 3730(e)(4)(B). The 2010 amendments to the FCA "expanded the definition of 'original source.'" *Moore*, 812 F.3d at 299. Before 2010, the statute required a relator to show "direct and independent knowledge" of the fraud. *Id.* Congress broadened that definition in 2010. All that Verity needs to show is that Verity has "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions." 31 U.S.C. § 3730(e)(4)(B).[13] The reference to

---

[13] The statute also requires that Verity have "voluntarily provided the information to the Government before filing an action." 31 U.S.C. § 3730(e)(4)(B). Verity did so. FAC ¶ 29.

OPPOSITION TO MOTION TO DISMISS

"publicly disclosed allegations or transactions" does not mean *all* public information; it refers instead to the information disclosed in one of the three statutory channels. *Moore*, 812 F.3d at 305.

A relator "'materially add[s]' to the publicly disclosed allegation or transaction of fraud" if the relator "contribute[s] significant additional information to that which has been publicly disclosed so as to improve its quality." *Id.* at 306. A relator is an original source if the relator "demonstrate[s] a new and undisclosed relationship between [publicly] disclosed facts." *United States ex rel. Integra Med Analytics, LLC v. Creative Sols. in Healthcare, Inc.*, 2019 WL 5970283, at *11 (W.D. Tex. Nov. 13, 2019) (quoting *United States ex rel. Colquitt v. Abbott Lab'ys*, 858 F.3d 365, 376 (5th Cir. 2017)).

Verity meets this standard. Verity's investigative work—identifying E&B's affiliate structure, cross-referencing multiple data sources, understanding the SBA's affiliation rules under 13 C.F.R. § 121.301(f), and synthesizing this information to reveal that E&B's certification was false—constitutes a material addition to any information contained in the statutory channels. Verity compared Form 5500 data (showing 300+ active participants) to PPP loan data (showing 257 reported employees), identified E&B's affiliates' own PPP applications (showing additional employees), reviewed the Galesi Group's website (identifying ownership and control relationships), and applied the SBA's affiliation rules to conclude that E&B's employee count should have been aggregated with its affiliates. This is precisely the "new and undisclosed relationship between [publicly] disclosed facts" that satisfies the original source exception. *Integra*, 2019 WL 5970283, at *11.

E&B's cases do not compel a different result. Mot. at 10. *Prather v. AT&T, Inc.* is inapposite because that case analyzed the pre-2010 "original source" definition. 847 F.3d 1097, 1103–04 (9th Cir. 2017). And in *Jazz Pharmaceuticals* (an out-of-Circuit district court decision) the relator's complaint "merely 'add[ed] some color' to previously disclosed facts," which included news articles that reported specifically on the defendant's suspicious conduct and that, standing alone, "provided the government with enough information to infer" the fraud itself. 802 F. Supp. 3d at 63. Here, by contrast, the public sources did not disclose E&B's fraud, much less give "the government ample notice of the potential fraud Relator alleges." *Id.* Only Verity's independent investigative work revealed the discrepancy.

OPPOSITION TO MOTION TO DISMISS

**B.    The FAC States a Plausible False Claims Act Violation Under Both Rule 8 and Rule 9(b)**

The False Claims Act imposes civil liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B). As here, "a claim under the False Claims Act can be false where a party merely falsely certifies compliance with a statute or regulation as a condition to government payment." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171 (9th Cir. 2006).

"[T]he essential elements of False Claims Act liability are: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 902 (9th Cir. 2017). E&B does not dispute the sufficiency of Verity's allegations on elements (3) and (4) and challenges the sufficiency of the allegations as to elements (1) and (2) only. E&B's meritless arguments raise numerous factual questions about its conduct and knowledge that cannot be resolved prior to discovery.

**1.    The FAC Pleads Falsity with the Particularity Rule 9(b) Requires**

Under Rule 9(b), a plaintiff "must state with particularity the circumstances constituting fraud." This means alleging "the who, what, when, where, and how of the misconduct charged." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016). Rule 9(b) "does not require absolute particularity or a recital of the evidence." *Id.* (quoting 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1298 (3d ed. 2016)). A complaint is "sufficient under Rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).

The FAC meets that standard with room to spare. Verity alleges that E&B (*the who*) falsely represented that it and its affiliates had 257 employees (*the what*) at the time of its Second Draw PPP loan application in 2021 (*the when*) on its SBA Form 2483-SD (*the where*) by signing the form and certifying compliance with PPP loan eligibility requirements while deliberately ignoring its affiliate relationships and the employees of those affiliates (*the how*). FAC ¶¶ 43–47, 59–64. E&B's

18
OPPOSITION TO MOTION TO DISMISS

20-page brief proves that E&B knows exactly what it is accused of. E&B devotes pages to explaining why the Form 5500 participant count does not equal E&B's employee count, more pages to challenging the affiliation allegations, and still more to attacking the FAC's sources. A defendant that mounts a detailed defense against each category of allegations cannot credibly turn around and claim it lacks "adequate notice." *United Healthcare*, 848 F.3d at 1180. The FAC satisfies Rule 9(b).

District courts have routinely denied motions to dismiss FCA claims arising out of PPP loans obtained by false certification. In *Hawthorne*, the court denied a motion to dismiss PPP FCA claims where the complaint alleged discrepancies between the employee count on the loan application and the defendant's 401(k) plan's Form 5500 filed with the Department of Labor. 2024 WL 4294878, at *6. The court held that "the SAC's allegations regarding these alleged discrepancies and omissions are sufficiently plausible to support an inference that the employee headcount submitted by Defendants in [the] PPP loan application was false." *Id.* The court further held that the defendant's 401(k) plan's "Form 5500 (filed with the Department of Labor)" is "'a specific statement of facts upon which Relator has founded the allegations." *Id.* at *6 n.5 (internal quotation marks and citation omitted). Similarly, in *Uhler*, the court denied a motion to dismiss an FCA claim based on "fraudulent statements contained in the PPP loan applications," holding that the "complaint adequately alleges a false claim and satisfies the heightened pleading standard of Rule 9(b)." 2025 WL 4350115, at *7–8. The FAC is squarely within this line of authority.

### 2. Two Independent Categories of Allegations Adequately Plead that E&B's 257-Employee Certification Was False

Verity need allege only "circumstances indicating falseness." *Id.* at *3. The FAC meets that standard comfortably, and the SAC far surpasses it. The FAC contains two categories of allegations, each of which independently sufficiently alleges "circumstances indicating that" E&B's statement of having 257 employees across its corporate group "was false." *Id.* Collectively, these allegations eviscerate E&B's challenge to the sufficiency of the allegations.

#### a. Allegations Regarding the E&B 401(k) Plan's Forms 5500—Showing 300+ Active Participants—Adequately Plead Falsity

The FAC pleads particularized facts that E&B and its affiliates had between 356 and 435 employees during the relevant time period. E&B's 401(k) retirement plan reported 407 active

participants at the beginning of 2019, 427 at the end of 2019, 435 at the start of 2020, and 356 at the end of 2020. FAC ¶¶ 72–73. The FAC further alleges that "active participants" *excluded* multiple categories of employees, meaning E&B's actual employee count was even *higher*. FAC ¶¶ 75–77. These allegations alone are sufficient to plead the falsity of E&B's statement that it and its affiliates had only 257 employees.

The SAC's additional allegations make it bulletproof against E&B's motion. The SAC alleges that the E&B 401(k) Plan's Forms 5500 were signed by Stephen Layton, E&B's President, who also served as the plan administrator. SAC ¶ 78. Moreover, the Forms 5500 attached an auditor's report stating that the plan covered "all employees of the Company *and certain affiliated companies*." SAC ¶ 80; ECF No. 41-3 at 29.

E&B counters by asking this Court to resolve a factual dispute at the pleading stage. E&B argues that the SBA uses a different employee-counting methodology than Form 5500. Mot. at 13–14. But this argument conflates the motion-to-dismiss standard with summary judgment. At this stage, Verity need only allege facts that make falsity *plausible*. *See Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss."). The discrepancy between E&B's certified 257 employees and its 401(k) plan's Form 5500's reporting of 356–435 participants raises a plausible inference of falsity. That is all Rule 9(b) requires.

*Hawthorne* rejected E&B's identical argument. There, the defendants argued that discrepancies between their PPP application and Forms 5500 were "'easily explainable.'" 2024 WL 4294878, *6 n.5. The court disagreed, holding that "allegations regarding these alleged discrepancies and omissions are sufficiently plausible to support an inference that the employee headcount submitted by Defendants in [their] PPP loan application was false." *Id.* at *6.

### b.    Allegations Regarding E&B's Affiliates' PPP Applications—Showing Hundreds More Employees—Adequately Plead Falsity

The FAC alleges that E&B's employee count, when properly aggregated with its affiliates', was even higher than the 356–435 employees E&B's 401(k) Plan reported in its Forms 5500. The FAC identifies three E&B affiliates that submitted their own PPP loan applications: Distribution

Unlimited, Inc. (69 employees), Rotterdam Ventures, Inc. (58 employees), and Northeastern Industrial Park, Inc. (20 employees). FAC ¶ 80. Taking these entities at their word from their *own* PPP loan applications, and combining their employee counts with E&B's reported 257 employees, the total is 404—well over the 300-employee threshold. FAC ¶ 81. The SAC identifies yet another E&B affiliate, Excalibur Well Services Corporation, which reported 157 employees on its First Draw PPP application and 99 employees on its Second Draw application. SAC ¶¶ 89–90. Adding Excalibur's employees pushes E&B's corporate group *over 500 employees*.

Knowing that its employee count explodes when aggregated with affiliates, E&B challenges the FAC's affiliation allegations. Mot. at 14–15. But the FAC adequately alleges affiliation under the applicable SBA regulations. "Affiliation based on ownership" arises when "a concern is an affiliate of an individual, concern, or entity that owns or has the power to control more than 50 percent of the concern's voting equity." FAC ¶ 36 (citing 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021)). The FAC alleges that the Galesi Group *owns* E&B Natural Resources and has owned E&B since 2003. FAC ¶ 52. This is not a conclusory allegation—it cites *E&B's own website*, which states that the "Galesi Group" took "full ownership" of E&B in 2003. *Id*. Ownership of more than 50% of voting equity is the textbook definition of affiliation under 13 C.F.R. § 121.301(f)(1). No "totality of circumstances" analysis is needed when the regulation's core definition is satisfied. The FAC identifies with specificity the common controllers of affiliated companies—which is another basis for proving affiliation. FAC ¶ 55.

E&B's reliance on *United States v. Associated Foreign Exchange Inc.*, 2026 WL 790778 (C.D. Cal. Mar. 13, 2026) is misplaced. There, the complaint alleged affiliation only by "overlapping directors" and a shared headquarters, which the court found did "not explain how these facts establish the type of 'control' required by § 121.103 under the totality of the circumstances." *Id.* at *3. Here, by contrast, the FAC alleges *ownership*—the paradigmatic basis for affiliation. E&B's own website says the Galesi Group owns E&B. FAC ¶ 52.

E&B's remaining arguments ignore the FAC. E&B wrongly states that "there are no allegations that David Buicko managed or directed *E&B*, itself." Mot. at 14. But the FAC alleges that David Buicko was CEO of the Galesi Group, and that the Galesi Group owns E&B. FAC ¶¶ 52, 55. E&B next contends that the FAC contains insufficient allegations "to show that any third party

controls *both* E&B and any other relevant entity." Mot. at 14. Wrong again. The FAC alleges that the Galesi Group (the third party) owns E&B and controls at least 25 other entities, each of which lists "CEO David M. Buicko" on their website. FAC ¶ 55. And the information in the E&B 401(k) Plan's Forms 5500, E&B website, and the Galesi Group's website all provide the "circumstances indicating falseness" that Rule 9(b) requires. *Uhler*, 2025 WL 4350115, at *3.

### 3. The FAC Adequately Pleads that E&B Acted with Requisite Scienter

The FCA does not require specific intent to defraud. It imposes liability on anyone acting "knowingly," which includes actual knowledge, deliberate ignorance, or reckless disregard for the truth. 31 U.S.C. § 3729(b)(1). Scienter "may be alleged generally." Fed. R. Civ. P. 9(b). All that is required is "sufficient factual matter from which a defendant's knowledge of a fraud might reasonably be inferred." *United States ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 679–80 (9th Cir. 2018). The FAC meets—and exceeds—this standard.

Contrary to E&B's arguments, the FAC's allegations do more than recite the scienter standard. They reference specific documentary evidence showing the discrepancy between E&B's certification and its own filings. E&B certified in its loan application that it and all its affiliates had only 257 employees, yet the E&B 401(k) Plan's Forms 5500 filed with the Department of Labor showed 356 to 435 active participants in the plan during the same period. FAC ¶¶ 62, 72–73. A company cannot plausibly claim ignorance of its own workforce size when other federal filings show that it had over 100 more employees than it certified. These allegations are more than sufficient to permit an inference of scienter. *See Hawthorne*, 2024 WL 4294878, at *8 (denying motion to dismiss where complaint alleged defendant misrepresented employee count); *Uhler*, 2025 WL 4350115, at *8–9 (finding allegations that executives "knew and understood the applicable requirements to receive PPP loans" and "nonetheless certified eligibility" sufficient).[14]

The FAC further alleges that "E&B Natural Resources deliberately ignored" its affiliate relationships and "signed its false SBA Form 2483-SD with knowledge of, or reckless disregard

---

[14] E&B's quibble that the FAC does not identify the loan application signatory, Mot. at 17, is a red herring. *Uhler*, 2025 WL 4350115, at *7 (denying motion to dismiss and rejecting argument that "Relator does not allege with particularity who made the statements on the PPP loan applications or who submitted the PPP loan applications"). E&B knows who signed its own loan application and "can prepare an adequate answer from the allegations." *Moore*, 885 F.2d at 540.

for, the truth." FAC ¶ 64. The FAC contains numerous allegations detailing that E&B was on notice of its obligation to count affiliate employees, including that the SBA Form 2483-SD stated the requirement explicitly multiple times and required E&B's representative to certify that he "read" the application instructions and applicable law. FAC ¶¶ 44–46. And the SBA's FAQs—posted on the SBA's website—expressly directed borrowers that they were "required to apply SBA's affiliation rules under 13 C.F.R. 121.301(f)." FAC ¶ 34; *see* FAC ¶¶ 35, 42. Moreover, many of E&B's affiliates bore names that made their relationship to E&B and the Galesi Group obvious such that E&B could not plausibly claim to have overlooked. [15] FAC ¶ 55. These constructive notice allegations suffice to plead scienter. *See United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008) ("In defining knowingly, Congress attempted to reach what has become known as the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted." (internal quotation marks and citations omitted)).

The SAC delivers the knockout blow. It alleges that Stephen Layton, E&B's *President* signed the Forms 5500 (showing well over 300 participants) and served as the plan administrator. SAC ¶ 78. E&B cannot credibly claim the FAC contains insufficient scienter allegations.

E&B's cases are readily distinguishable. Mot. at 17. In *United States v. Corinthian Colleges*, the Ninth Circuit affirmed dismissal because there were no allegations "to support an inference or render plausible that Corinthian acted while knowing" the truth. 655 F.3d 984, 997 (9th Cir. 2011). Here, the FAC pleads precisely what the *Corinthian* complaint lacked: a specific contradiction from E&B's *own filings*—Forms 5500 showing 356–435 employees while E&B certified having only 257. *Adomitis ex rel. United States v. San Bernardino Mountains Community Hospital District*, 816 F. App'x 64 (9th Cir. 2020) fares no better. In *Adomitis*, a relator alleged that a hospital filed Medicare reimbursements at Critical Access Hospital rates without meeting the applicable distance terrain criterion. *Id.* at 66–67. The Ninth Circuit affirmed dismissal because the relator's allegation that the defendant's "senior officials must have known" the true distance and terrain was based solely on the assertion that the officials "routinely driv[e] the segments in question." *Id.* at 67. The

---

[15] These entities include "E&B Sb Ventures I Corporation"; "E&B Sb Ventures II Corporation"; "Galesi Management Corporation"; and "Galesi Property Services, Inc." FAC ¶ 55.

court found those allegations to be "too vague and conclusory." *Id.* The *Adomitis* relator could point to no document demonstrating that the defendant knew the relevant facts, only speculation that its senior officials "must have" learned them while driving. *Id.* Here, the FAC does not allege a "must have known" inference; it bases its allegations on contradictory E&B filings concerning the specific false statement.

### C. The FAC Pleads a Distinct Reverse FCA Claim Based on E&B's Post-Loan Concealment and Knowing Retention of Funds

The reverse FCA provision, 31 U.S.C. § 3729(a)(1)(G), imposes liability on anyone who "knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." The statute defines "obligation" to include "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

Courts distinguish between redundant and non-redundant reverse FCA claims based on whether the allegations target conduct that is "separate and distinct from the direct false claim provision." *United States v. Mariner Health Care, Inc.*, 552 F. Supp. 3d 938, 953 (N.D. Cal. 2021)."[A] direct false-claim violation is complete as soon as the person submits the false claim or makes the false statement," and "if the person later receives money from the government based on his prior false claim or statement and does not return it, he could be deemed to have committed a second FCA violation." *Id.*

Here, the reverse FCA claim targets E&B's conduct *after* its false certification on its SBA Form 2483-SD. Specifically, the claim under § 3729(a)(1)(G) targets E&B's conduct of: (1) seeking loan forgiveness despite knowing of its ineligibility; (2) participating in the forgiveness process without disclosing its false certification; and (3) knowingly retaining over $2 million for more than four years. FAC ¶¶ 67, 97. The FAC alleges that E&B presented a false claim "for approval of a Second Draw PPP loan." FAC ¶ 85. It then alleges that *at a later date*, after receiving approval, E&B submitted a *different* application to avoid its obligation to repay the loan. FAC ¶ 67. This is distinct liability for "a separate wrong." *Mariner*, 552 F. Supp. 3d at 954.

The SAC strengthens these allegations further, identifying E&B's specific obligation. E&B's contractual obligation arose from its lending contract with PNC Bank (acting under delegated Government authority), which required E&B to repay the loan. SAC ¶ 106. Because E&B was ineligible to receive the loan, it was also ineligible for forgiveness. SAC ¶ 107. By submitting a Forgiveness Application while knowing it was ineligible, E&B "knowingly and improperly avoided [its] obligation to repay the loan." SAC ¶¶ 108–09.

E&B's cases, Mot. at 18–19, are inapposite because in each, the plaintiff failed to allege any post-certification conduct. *See United States v. Kinetic Concepts, Inc.*, 2017 WL 2713730, at *13 (C.D. Cal. Mar. 6, 2017) (plaintiff alleged only that defendant "fraudulently overcharged the government and then failed to repay"); *United States ex rel. Thomas v. Siemens AG*, 708 F. Supp. 2d 505, 514 (E.D. Pa. 2010) (similar); *Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii* LLC, 512 F. Supp. 3d 1096, 1119 (D. Haw. 2021) (claim "based on a defendant's failure to *refund* the *same* payment"). Here, by contrast, Verity alleges distinct conduct: E&B participated in the forgiveness process, submitted a Forgiveness Application, implicitly certified its continued eligibility, and has retained over $2 million for more than four years. FAC ¶¶ 67, 97–98.

E&B's assertion that the FAC is "devoid of any plausible facts" showing E&B knew of its obligation to repay the Government is wrong. Mot. at 20. The FAC alleges that "Defendant knew it improperly received money from the SBA," "had an obligation to pay back the SBA," "knew of its obligation," and "improperly avoided its obligation." FAC ¶¶ 97–100. The FAC also alleges circumstances from which E&B's knowledge of its ineligibility can be inferred: the E&B 401(k) Plan's own Forms 5500 showed 356–435 active plan participants—well over the 300-employee threshold—and E&B "deliberately ignored" its affiliate relationships when certifying to having only 257 employees. FAC ¶¶ 64, 72–76. These allegations are sufficient.

**V.    Conclusion**

Verity respectfully requests that the Court deny E&B's motion to dismiss.

OPPOSITION TO MOTION TO DISMISS

Dated: June 5, 2026

**SUSMAN GODFREY L.L.P.**

By: */s/ Shauli Bar-On*
Oleg Elkhunovich (269238)
oelkhunovich@susmangodfrey.com
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Stephen Shackelford, Jr. (*pro hac vice* forthcoming)
Steven M. Shepard (admitted *pro hac vice*)
Amy B. Gregory (admitted *pro hac vice*)
Shauli Bar-On (356650)
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sshackelford@susmangodfrey.com
sshepard@susmangodfrey.com
agregory@susmangodfrey.com
sbar-on@susmangodfrey.com

*Attorneys for Plaintiff/Relator Verity Investigations, LLC*