Oleg Elkhunovich (269238)
oelkhunovich@SusmanGodfrey.com
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Steven M. Shepard (admitted *pro hac vice*)
Amy B. Gregory (admitted *pro hac vice*)
Shauli Bar-On (356650)
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sshepard@susmangodfrey.com
agregory@susmangodfrey.com
sbar-on@susmangodfrey.com

*Attorneys for Relator Verity Investigations, LLC*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

UNITED STATES OF AMERICA, *ex rel.* VERITY INVESTIGATIONS, LLC

*Plaintiff Relator*,

vs.

E&B NATURAL RESOURCES MANAGEMENT CORPORATION

*Defendant*.

Case No. 1:24-cv-00928-KES-CDB

**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.***

**JURY TRIAL DEMANDED**

## *QUI TAM* COMPLAINT

## I. INTRODUCTION

1. This is a *qui tam* case, filed on behalf of the federal government, seeking to recover over $2 million (plus mandatory trebling) that Defendant wrongfully obtained in the form of a federal guaranteed loan by falsely certifying that it had fewer than 300 employees. That loan was later forgiven, and the federal government paid the bill.

2. The loan in question was provided by the Small Business Administration's ("SBA's") Paycheck Protection Program ("PPP"). The PPP was created by Congress near the start of the COVID-19 epidemic in the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") in 2020, and then received additional funding ($284 billion) in December 2020 in the "Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act."[1] 15 U.S.C. § 636(a)(37).

3. In early 2021, SBA authorized a second series of PPP loans, widely referred to as "Second Draw" PPP loans. This case involves a false application for a Second Draw PPP loan.

4. The Second Draw PPP loans were made available only to "small" businesses. The SBA established a clear, bright-line rule for who counted as "small." Applicants were required to certify, in their application, that they (both the applicant and its affiliates) collectively employed 300 or fewer persons.[2]

5. Defendant falsely certified to the SBA that it had 257 employees. As a direct result of that false statement, Defendant obtained a Second Draw PPP loan of $2,000,000.00, which was later forgiven.

6. Relator is an outside investigative company that detected Defendant's fraud by reviewing the Form 5500 that Defendant's employees' 401(k) plan filed with the Department of Labor. Those forms indicated that the 401(k) plan had more than 300 "active participants" in each of 2019, 2020, and 2021. Because an "active participant" is an employee, these forms'

---

[1] SBA INSPECTOR GENERAL INSPECTION REPORT, The Small Business Administration's Implementation of Recommended Controls and the Economic Aid Act (Aug. 12, 2021), https://www.sba.gov/sites/sbagov/files/2021-08/SBA%20OIG%20Report%2021-19.pdf.

[2] SMALL BUSINESS ADMINISTRATION, Second Draw PPP loan, https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/second-draw-ppp-loan.

representations to the Department of Labor give the lie to Defendant's false statement to the SBA that it and its affiliates collectively employed fewer than 300 persons.

## II. THE PARTIES

7. Plaintiff Verity Investigations LLC ("Relator") is an investigative firm formed by two professionals with widespread experience in detecting and reporting fraud on the U.S. public fisc.

8. Defendant E&B Natural Resources Management Corporation is a California corporation with its principal place of business in Bakersfield, California.

## III. JURISDICTION AND VENUE

9. This action arises under the laws of the United States to redress violations of the Federal False Claims Act, 31 U.S.C. §§ 3729–33 ("FCA").

10. Subject-matter jurisdiction is conferred by 28 U.S.C. §§ 1331, 1345.

11. Venue is proper, and this Court has personal jurisdiction over Defendant, because Defendant is "found" in this District. 31 U.S.C. § 3732(a).

## IV. THE FALSE CLAIMS ACT

12. The FCA is the primary civil remedial statute designed to deter fraud upon the United States. Its purpose is to "enhance the Government's ability to recover losses sustained as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (July 28, 1986).

13. A defendant violates the FCA when the defendant "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A).

14. Under the FCA, a claim includes a request for money. 31 U.S.C. § 3729(b)(2). A claim is "false or fraudulent" under the FCA if the entity or person submitting the claim was not entitled to payment.

15. In 2009, Congress amended the FCA through the Fraud Enforcement and Recovery Act of 2009 ("FERA"), Pub. L. No. 111-21 (May 20, 2009), making a defendant liable under the FCA when the defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B).

16. Under the FCA, the terms "knowing" and "knowingly" mean that the defendant "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of

the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

17. No proof of specific intent to defraud the Government is required to show that a defendant acted knowingly under the FCA. 31 U.S.C. § 3729(b)(1)(B).

18. The terms "knowing," "knowingly," "knowledge," "knows," and "knew," as used in this Complaint, have the meaning ascribed to them by the FCA.

19. The FCA defines the term "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

20. The FCA broadly defines a "claim" as "any request or demand . . . for money or property" that: "(i) is presented to an officer, employee, or agent of the United States," or "(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(b)(2).

21. The FCA imposes treble damages plus a civil penalty for each false claim. *See* 31 U.S.C. § 3729(a)(1).

22. The minimum and maximum civil penalty amounts are adjusted for inflation each successive year under the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. No. 114-74, § 701, 129 Stat. 584, 599–601 (2015). *See* 28 C.F.R. § 85.5 (identifying applicable inflation adjustments on an annual basis); 31 U.S.C. § 3729(a)(1).

23. As of February 12, 2024, courts must assess a civil penalty of no less than $13,946 and no more than $27,894 per claim for FCA violations that occurred after November 2, 2015. *See* 28 C.F.R. § 85.5 Table 1.

24. False statements made in a loan application to a third-party lender qualify as "false claims" to the government where, as here, the loan is guaranteed by the federal government and the federal government later repays the lender. *See United States v. Van Oosterhout*, 96 F.3d 1491, 1494 (D.C. Cir. 1996).

## V. NO "PUBLIC DISCLOSURE" AND RELATOR IS AN ORIGINAL SOURCE

25. On information and belief, no "public disclosure" has been made of Defendant's false statement and fraud detailed herein. 31 U.S.C. § 3730(e)(4)(A).

26. On information and belief, Defendant's fraudulent transactions have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or by the news media.

27. Even if there had been a "public disclosure," that would not matter in this case because Relator is an "original source of the information" set forth in this complaint. 31 U.S.C. § 3730(e)(4)(A).

28. Relator's knowledge is independent of and materially adds to any publicly disclosed aspects of the fraudulent transactions described herein. Among other things, Relator has "connected the dots" between (a) Defendant's Form 5500 disclosures, other statements, and affiliate relationships, and (b) Defendant's false statements made in Defendant's application for the Second Draw PPP loan.

29. Prior to filing this action, Relator voluntarily provided the Government with the complaint and all material evidence in Relator's possession relating to the fraudulent transactions.

## VI. THE SECOND DRAW PPP LOAN PROGRAM

30. To be eligible for a Second Draw PPP loan, borrowers were required to meet three criteria: (1) have "[p]reviously received a First Draw PPP Loan," (2) "[have] no more than 300 employees," and (3) be able to "demonstrate at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020."[3] 15 U.S.C. § 636(a)(37)(A)(iv).

31. The SBA's website explained the 300-limit to borrowers. This was explained in an overview page of the website[4] and in the online "Frequently Asked Questions" document available on the website.[5]

[3] SMALL BUSINESS ADMINISTRATION, Second Draw PPP loan, https://www.sba.gov/funding-programs/loans/covid-19-relief-options/paycheck-protection-program/second-draw-ppp-loan.

[4] SMALL BUSINESS ADMINISTRATION, Second Draw PPP loan, https://perma.cc/R74F-68UQ?type=image (as of March 2021).

[5] SMALL BUSINESS ADMINISTRATION, FAQ for PPP Borrowers and Lenders, https://perma.cc/5Y8K-CR5Y (as of March 2021).

32. The SBA's FAQ document stated that this limit was "narrower" than the prior 500-employee limit for the earlier First Draw PPP loans.[6]

33. The SBA's FAQ document warned borrowers that, unlike with the First Draw PPP loans, borrowers would not be allowed to qualify using "SBA's [other] established size standards (either revenue-based or employee-based) or the alternative size standard."[7]

34. The SBA's FAQ stated that "borrowers" were "required to apply SBA's affiliation rules under 13 C.F.R. 121.301(f)."[8]

35. That regulation—13 C.F.R. § 121.301(f)—stated that when counting "employees," an applicant must include the employees of "all of its domestic and foreign affiliates." 13 C.F.R. § 121.301(f)(6).[9]

36. That regulation defined "affiliate" broadly. The term includes "affiliation based on ownership": "For determining affiliation based on equity ownership, a concern is an affiliate of an individual, concern, or entity that owns or has the power to control more than 50 percent of the concern's voting equity. If no individual, concern, or entity is found to control, SBA will deem the Board of Directors or President or Chief Executive Officer (CEO) (or other officers, managing members, or partners who control the management of the concern) to be in control of the concern. SBA will deem a minority shareholder to be in control, if that individual or entity has the ability, under the concern's charter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders." *See* 13 C.F.R. § 121.301(f)(1).[10]

37. Affiliation may also arise "under stock options, convertible securities, and agreements to merge." *See* 13 C.F.R. § 121.301(f)(2).[11]

38. Affiliation may arise "based on management:" "Affiliation arises where the CEO or President of the applicant concern (or other officers, managing members, or partners who control

---

[6] SMALL BUSINESS ADMINISTRATION, FAQ for PPP Borrowers and Lenders, at 29, https://www.sba.gov/document/support-faq-ppp-borrowers-lenders.

[7] SMALL BUSINESS ADMINISTRATION, FAQ for PPP Borrowers and Lenders, at 29, https://www.sba.gov/document/support-faq-ppp-borrowers-lenders.

[8] SMALL BUSINESS ADMINISTRATION, FAQ for PPP Borrowers and Lenders, at 3, https://www.sba.gov/document/support-faq-ppp-borrowers-lenders.

[9] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).

[10] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).

[11] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).

the management of the concern) also controls the management of one or more other concerns. Affiliation also arises where a single individual, concern, or entity that controls the Board of Directors or management of one concern also controls the Board of Directors or management of one of more other concerns. Affiliation also arises where a single individual, concern or entity controls the management of the applicant concern through a management agreement." *See* 13 C.F.R. § 121.301(f)(3).[12]

39. Affiliation may arise "based on identity of interest:" "Affiliation arises when there is an identity of interest between close relatives, as defined in 13 CFR 120.10, with identical or substantially identical business or economic interests (such as where the close relatives operate concerns in the same or similar industry in the same geographic area). Where SBA determines that interests should be aggregated, an individual or firm may rebut that determination with evidence showing that the interests deemed to be one are in fact separate." *See* 13 C.F.R. § 121.301(f)(4).[13]

40. Affiliation may arise "based on franchise and license agreements:" "The restraints imposed on a franchisee or licensee by its franchise or license agreement generally will not be considered in determining whether the franchisor or licensor is affiliated with an applicant franchisee or licensee provided the applicant franchisee or licensee has the right to profit from its efforts and bears the risk of loss commensurate with ownership. SBA will only consider the franchise or license agreements of the applicant concern." See 13 C.F.R. § 121.301(f)(5).[14]

41. The SBA required borrowers to submit a Borrower Application Form (SBA Form 2483-SD) to a federally insured bank or similar credit institution, which would process the loan application and fund the loan.

42. SBA rules made clear that "[i]t is the responsibility of the *borrower* to determine which entities (if any) are its affiliates," and "*[b]orrowers* must apply the affiliation rules set forth in SBA's Interim Final Rule on Affiliation."[15]

---

[12] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).
[13] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).
[14] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).
[15] SMALL BUSINESS ADMINISTRATION, FAQ for PPP Borrowers and Lenders, at 3, https://perma.cc/5Y8K-CR5Y (emphasis in original) (emphasis added).

43. The SBA Form 2483-SD required the applicant's authorized representative to certify that the applicant was "eligible to receive a loan under the rules in effect at the time this application is submitted."

44. The SBA Form 2483-SD required the applicant's authorized representative to certify that they "read" the Second Draw PPP loan application instructions, "the Statements Required by Law and Executive Orders," and "the rules in effect at the time this application is submitted."

45. The SBA Form 2483-SD required the borrower to state the "Number of Employees (including affiliates, if applicable)."

46. The SBA Form 2483-SD required the applicant's authorized representative to certify eligibility by signing a statement that "[t]he Applicant, together with its affiliates (if applicable) . . . employs no more than 300 employees."

47. The SBA Form 2483-SD also required the applicant's authorized representative to initial to "certify that the information provided in this application . . . is true and accurate," and to acknowledge "that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000 . . . ."

48. The SBA guaranteed 100% of the outstanding balance of Defendant's Second Draw PPP loan. The guarantee was backed by the full faith and credit of the United States. 15 U.S.C. § 636(a)(2)(F).

## VII. DEFENDANT FALSELY CERTIFIED TO THE SBA ITS COMPLIANCE WITH THE SECOND DRAW PPP LOAN SIZE REQUIREMENTS

### A. BACKGROUND

49. Upon information and belief, Defendant E&B Natural Resources Management Corporation ("E&B Natural Resources" or "Defendant") is a corporation registered in California[16] and headquartered at 1608 Norris Road, Bakersfield, CA 93308.[17]

[16] California, Secretary of State, E&B Natural Resources Management Corporation (for No. 666392).

[17] California, Secretary of State, E&B Natural Resources Management Corporation (for No. 666392).

50. E&B Natural Resources can be validly served with process at 1608 Norris Road, Bakersfield, CA 93308.[18]

51. E&B Natural Resources is a natural resources company that develops existing and acquired assets and implements thermal enhanced oil recovery and other technologies to expand existing oil production.[19] It was founded in 1971.[20]

52. Upon information and belief, throughout 2019–2021, E&B Natural Resources' directors included Alan White and David Buicko.[21]

53. Upon information and belief, throughout 2019–2021, E&B Natural Resources' executives included Gary Richardsino (secretary), Hany Francisc (CEO), and Stephen Layton (CEO and President).[22]

54. Upon information and belief, throughout 2019–2021, Stephen Layton was also the Chief Executive Officer and President of Excalibur Well Services Corporation ("Excalibur"), which, like Defendant, is headquartered in Bakersfield, California.[23]

55. Since 2003, the Galesi Group owns E&B Natural Resources.[24]

56. The Galesi Group owns and manages a diverse real estate portfolio in excess of over 11 million square feet. With a staff of 150 real estate and property management professionals, the Galesi Group provides a full array of property management services.[25]

57. Under the Galesi Group's leadership, E&B Natural Resources has focused its business model to grow through value acquisitions in California, Louisiana, Kansas, and Wyoming.[26]

---

[18] California, Secretary of State, E&B Natural Resources Management Corporation (for No. 666392).
[19] E&B Natural Resources, Home, https://www.ebresources.com/.
[20] E&B Natural Resources, About, https://www.ebresources.com/about.
[21] BizProfile, E&B Natural Resources Management Corporation, https://www.bizprofile.net/ca/bakersfield/e-b-natural-resources.
[22] BizProfile, E&B Natural Resources Management Corporation, https://www.bizprofile.net/ca/bakersfield/e-b-natural-resources.
[23] Better Business Bureau, *Excalibur well Services Corporation*, https://www.bbb.org/us/ca/bakersfield/profile/oil-well-services/excalibur-well-services-corporation-1126-89041722.
[24] E&B Natural Resources, About, https://www.ebresources.com/about.
[25] The Galesi Group Website, History, https://www.galesi.com/history/.
[26] E&B Natural Resources, About, https://www.ebresources.com/about.

58. The Galesi Group, through its CEO David M. Buicko and other executives, controlled numerous entities throughout the time period 2019-2021. Those entities include:

a. Galesi Management Corporation, managed by CEO David M. Buicko;[27]

b. Galesi Property Services, Inc., managed by CEO David M. Buicko;[28]

c. Harlem River Yard Ventures, Inc., managed by CEO David M. Buicko;[29]

d. Fg Ventures, Inc., managed by CEO David M. Buicko;[30]

e. Distribution Unlimited, Inc. f/k/a FG Ventures, Inc., managed by CEO David M. Buicko;[31]

f. Colonie Ventures, Inc., managed by CEO David M. Buicko;[32]

g. Albany Ventures, Inc., managed by CEO David M. Buicko;[33]

h. Argonox Realty Corporation, managed by CEO David M. Buicko;[34]

i. Northeastern IP Holdings, Inc., managed by CEO David M. Buicko;[35]

j. Northeastern Industrial Park, Inc., managed by CEO David M. Buicko;[36]

k. Scotia Holdings, Inc., managed by CEO David M. Buicko;[37]

l. Colonie Ventures, Inc., managed by CEO David M. Buicko;[38]

---

[27] BizProfile, Galesi Management Corporation, https://www.bizprofile.net/ny/schenectady/galesi-management-corporation.

[28] BizProfile, Galesi Property Services, Inc., https://www.bizprofile.net/ny/schenectady/galesi-property-services-inc-2.

[29] BizProfile, Harlem River Yard Ventures, Inc., https://www.bizprofile.net/ny/schenectady/harlem-river-yard-ventures.

[30] BizProfile, Fg Ventures, Inc., https://www.bizprofile.net/ny/schenectady/fg-ventures-inc.

[31] BizProfile, Distribution Unlimited, Inc., https://www.bizprofile.net/ny/schenectady/distribution-unlimited-inc.

[32] BizProfile, Colonie Ventures, Inc., https://www.bizprofile.net/ny/schenectady/colonie-ventures-inc.

[33] BizProfile, Albany Ventures, Inc., https://www.bizprofile.net/ny/schenectady/albany-ventures-inc.

[34] BizProfile, Argonox Realty Corporation, https://www.bizprofile.net/ny/schenectady/argonox-realty-corporation.

[35] BizProfile, Northeastern Ip Holdings, Inc., https://www.bizprofile.net/ny/schenectady/northeastern-ip-holdings-inc.

[36] BizProfile, Northeastern Industrial Park, Inc., https://www.bizprofile.net/ny/schenectady/northeastern-industrial-park-inc-2.

[37] BizProfile, Scotia Holdings, Inc., https://www.bizprofile.net/ny/schenectady/scotia-holdings-inc.

[38] BizProfile, Colonie Ventures, Inc., https://www.bizprofile.net/ny/schenectady/colonie-ventures-inc.

m. Equinox Equities, Inc., managed by CEO David M. Buicko;[39]

n. T & B Development, Inc., managed by CEO David M. Buicko;[40]

o. Erly Realty Development, Inc., managed by CEO David M. Buicko;[41]

p. Sg Properties Ventures, Inc., managed by CEO David M. Buicko;[42]

q. Rcp17, Inc., managed by CEO David M. Buicko;[43]

r. Rotterdam Ventures Inc. d/b/a Galesi Group, managed by CEO David M. Buicko;[44]

s. E&B Sb Ventures II Corporation, directed by David M. Buicko;[45]

t. E&B Sb Ventures I Corporation, directed by David M. Buicko;[46]

u. Hexadyne Energy Corporation, directed by David M. Buicko;[47]

v. Hillcrest Beverly Oil Corporation, directed by David M. Buicko;[48]

w. Hboc Energy Marketing, Inc., directed by David M. Buicko;[49]

x. Western Continental Operating Company, directed by David M. Buicko;[50]

---

[39] BizProfile, Equinox Equities, Inc., https://www.bizprofile.net/ny/schenectady/equinox-equities-inc.

[40] BizProfile, T & B Development, Inc., https://www.bizprofile.net/ny/schenectady/t-b-development-inc.

[41] BizProfile, Erly Realty Development, Inc., https://www.bizprofile.net/ny/schenectady/erly-realty-development-inc.

[42] BizProfile, Sg Properties Ventures, Inc., https://www.bizprofile.net/ny/schenectady/sg-properties-ventures-inc.

[43] BizProfile, Rcp17, Inc., https://www.bizprofile.net/ny/schenectady/rcp17-inc.

[44] Rebh v. Rotterdam Ventures Inc (1998); Hunts Point Terminal Produce Cooperative Association Inc. v. Harlem River Yard Ventures, Inc., Harlem River Ventures II, Inc., and Francesco Galesi (Filed July 16, 2007); BizProfile, Rotterdam Ventures, Inc., https://www.bizprofile.net/ny/schenectady/rotterdam-ventures-inc-2.

[45] BizProfile, E&B Sb Ventures II Corporation, https://www.bizprofile.net/ca/bakersfield/e-b-sb-ventures-2.

[46] BizProfile, E&B Sb Ventures I Corporation, https://www.bizprofile.net/ca/bakersfield/e-b-sb-ventures.

[47] BizProfile, Hexadyne Energy Corporation, https://www.bizprofile.net/ca/bakersfield/hexadyne-energy-corporation.

[48] BizProfile, Hillcrest Beverly Oil Corporation, https://www.bizprofile.net/ca/bakersfield/hillcrest-beverly-oil-corporation.

[49] BizProfile, Hboc Energy Marketing, Inc., https://www.bizprofile.net/ca/bakersfield/hboc-energy-marketing-inc.

[50] BizProfile, Western Continental Operating Company, https://www.bizprofile.net/ca/bakersfield/western-continental-operating-company.

y. Laymance Oil Company, directed by David M. Buicko;[51]

z. Excalibur Well Services Corporation, directed by David M. Buicko, and managed by its CEO and President, Stephen Layton, who was at the same time Defendant's CEO and President;[52]

aa. E&B ENR I, LLC, managed by E&B Natural Resources Management Corporation;[53]

bb. GEB Ventures, LLC, managed by E&B Natural Resources Management Corporation;[54]

cc. New Hope Lease #020600478, LLC, managed by E&B Natural Resources Management Corporation;[55]

dd. Noriega O&G, LLC, managed by E&B Natural Resources Management Corporation;[56]

ee. Elysium Natural Resources, LLC, managed by E&B Natural Resources Management Corporation;[57]

ff. Elysium Russell, LLC, managed by E&B Natural Resources Management Corporation;[58]

gg. Elysium West, LLC, managed by E&B Natural Resources Management Corporation.[59]

---

[51] BizProfile, Laymance Oil Company, https://www.bizprofile.net/ca/bakersfield/laymance-oil-company.
[52] BizProfile, Excalibur Well Services Corporation, https://www.bizprofile.net/ca/bakersfield/excalibur-well-services-corporation.
[53] BizProfile, E&B ENR I, LLC, https://www.bizprofile.net/ny/schenectady/e-b-enr-i.
[54] BizProfile, GEB Ventures, LLC, https://www.bizprofile.net/ny/schenectady/geb-ventures-llc.
[55] BizProfile, New Hope Lease #020600478, LLC, https://www.bizprofile.net/ny/schenectady/new-hope-lease-020600478.
[56] BizProfile, Noriega O&G, LLC, https://www.bizprofile.net/ny/schenectady/noriega-o-g-llc.
[57] BizProfile, Elysium Natural Resources, LLC, https://www.bizprofile.net/ny/schenectady/elysium-natural-resources-llc.
[58] BizProfile, Elysium Russell, LLC, https://www.bizprofile.net/ca/bakersfield/elysium-russell-llc.
[59] BizProfile, Elysium West, LLC, https://www.bizprofile.net/ca/bakersfield/elysium-west-llc.

59. The Galesi Group identifies E&B Natural Resources and Distribution Unlimited as "affiliates" of the Galesi Group. The website also states that Galesi Group has operated Northeastern Industrial Park (another of the affiliates listed above) since 1965.

60. On information and belief, E&B Natural Resources, the Galesi Group, and the entities listed in ¶ 58, *supra*, qualify as "affiliates" for purposes of the PPP Loan program under one or more of the alternative definitions provided in 13 C.F.R. § 121.301(f).

61. At a minimum, Defendant and Excalibur are affiliates based on management under 13 C.F.R. § 121.301(f)(3).[60] "Affiliation arises where the CEO or President of the applicant concern . . . also controls the management of one or more other concerns." Stephen Layton was the CEO and President of Defendant, the applicant concern, and at the same time was the CEO and President of Excalibur. He therefore controlled the management of both companies.

**B. <u>THE SECOND DRAW PPP LOAN APPLICATION</u>**

62. In 2020, E&B Natural Resources submitted its Borrower Application form to apply for a First Draw PPP loan in the amount of $5,527,940.00.

63. On or about June 11, 2021, the U.S. government forgave 100% of E&B Natural Resources' First Draw PPP loan, including interest, in the amount of $5,591,511.31.

64. In 2021, E&B Natural Resources applied for a Second Draw PPP loan.

65. E&B Natural Resources submitted its Borrower Application form, SBA Form 2483-SD, to PNC Bank, National Association, in Wilmington, Delaware.

66. On its Form 2483-SD, E&B Natural Resources listed its address as 1608 Norris Rd, Bakersfield, CA 93308-2234.

67. On or about February 18, 2021, E&B Natural Resources was approved for a Second Draw PPP loan in the amount of $2,000,000.00 by lender PNC Bank.

68. The U.S. government paid lender PNC Bank a lender's processing fee of 1% of the $2,000,000.00 loan, in the amount of $20,000.00.[61]

---

[60] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).

[61] Paycheck Protection Program (PPP) Information Sheet: Lenders, https://home.treasury.gov/system/files/136/PPP%20Lender%20Information%20Fact%20Sheet.pdf.

69. On or about March 4, 2022, the U.S. government forgave 100% of E&B Natural Resources' Second Draw PPP loan, including interest, in the amount of $2,020,777.78.

**C. DEFENDANT'S FALSE STATEMENTS AND CERTIFICATIONS**

70. On its SBA Form 2483-SD, E&B Natural Resources responded "257" to the question asking it to state the "Number of Employees (including affiliates, if applicable)."

71. That response was false. E&B Natural Resources and its affiliates had far more than 300 employees in each of 2019, 2020 and 2021, as further detailed below.

72. The SBA Form 2483-SD also required E&B Natural Resources to certify that "[t]he Applicant, together with its affiliates (if applicable) . . . employs no more than 300 employees." That certification was false for the same reason: E&B Natural Resources and its affiliates had far more than 300 employees.

73. The SBA Form 2483-SD also required E&B Natural Resources to certify that it was "eligible to receive a loan under the rules in effect at the time this application is submitted." That certification was false because Defendant was not in fact eligible to receive a Second Draw PPP loan because it and its affiliates employed more than 300 employees.

**D. EVIDENCE OF MORE THAN 300 EMPLOYEES**

**1. Evidence from Defendant's Forms 5500**

74. E&B Natural Resources maintained a 401(k) retirement plan for its employees and the employees of "certain affiliates." In 2019, 2020, and 2021, the E&B Natural Resources Employee Benefits Plan had the following legal name: E&B Natural Resources Management Corp. 401(k) Plan (hereafter, the "E&B Natural Resources Employee Benefits Plan" or "the Plan").

75. The Plan is "sponsored" by Defendant E&B Natural Resources.

76. Each year, the E&B Natural Resources Employee Benefits Plan was required to file a Form 5500 with the U.S. Department of Labor. That form required the Plan to state the "number of active participants" at the beginning and end of the plan year. Form 5500 also instructed the Plan that "active participants" are "individuals who are currently in employment covered by the plan and who are earning or retaining credited service under the plan."[62]

[62] Instructions for Form 5500.

77. Defendant's Forms 5500 were signed, in each of 2019, 2020 and 2021, by Stephen Layton. Mr. Layton was in each year the President of Defendant. The Forms 5500 also identified Mr. Layton as the "plan administrator" of the Plan.

78. The E&B Natural Resources Employee Benefits Plan represented in its Forms 5500 that it was a "single employer" plan, meaning that it provided pension benefits solely to the employees of E&B Natural Resources and to other companies that were at least 80% owned by the owner of E&B Natural Resources.[63] *See* 26 CFR § 1.414(c)-2(b)(2).

79. The Forms 5500 attached an "auditor's report" signed by the Plan's outside auditor (Whitley Penn LLP). In each year of 2019, 2020 and 2021, the auditor's report included a section entitled "Description of the Plan." In each of these sections, the report indicated that the active participants in the plan included "employees of … certain affiliated companies." Specifically, the reports stated (with emphases added):

> The Plan . . . is a defined contribution plan available to all employees of the Company *and certain affiliated companies*, who have attained age 18 and completed the lesser of 1,000 hours of service within 12 consecutive months, or three consecutive months of employment. All employees of the Company *and certain affiliates* are eligible to participate in the Plan, except for those employees covered by a collective bargaining agreement, leased employees, and non-resident aliens. Eligible employees may enter the Plan on the first day of month after meeting eligibility requirements.

80. In 2019, the E&B Natural Resources Employee Benefits Plan reported 407 active participants at the start and 427 active participants at the end of the year.[64]

81. In 2020, the E&B Natural Resources Employee Benefits Plan reported 435 active participants at the start and 356 active participants at the end of the year.[65]

82. In 2021, the E&B Natural Resources Employee Benefits Plan reported 356 active participants at the start and 336 active participants at the end of the year.[66]

---

[63] The plan's Forms 5500 for 2019, 2020, and 2021 check the box in section A attesting that it was "a single-employer plan." The plan's Forms 5500 for 2019, 2020, and 2021 list the "employer" as "E&B Natural Resources Management Corp." The Forms 5500 also give the same Employer Identification Number. The address is listed as 1608 Norris Road, Bakersfield, CA 93308-2234 in 2020 and 2021, and 1600 Norris Road, Bakersfield, CA 93308-2234 in 2019. Those were the addresses of Defendant's headquarters in each of those years.

[64] Form 5500 (2019).

[65] Form 5500 (2020).

[66] Form 5500 (2021).

83. Upon information and belief, the "active participants" listed in E&B Natural Resources Employee Benefits Plan's Forms 5500 was significantly *less* than the actual number of employees of E&B Natural Resources and its affiliated companies.

84. The number of "active participants" reported in the E&B Natural Resources Employee Benefits Plan excluded multiple categories of employees, including those who had not "attained age 18 and completed the lesser of 1,000 hours of service within 12 consecutive months, or three consecutive months of employment" and "those employees covered by a collective bargaining agreement, leased employees, and non-resident aliens."[67]

85. Upon information and belief, the number of "active participants" reported in the E&B Natural Resources Employee Benefits Plan also excluded at least some of E&B Natural Resources' affiliates listed above in ¶ 58.

**2. Evidence from the Galesi Group Website**

86. The Galesi Group's website identifies E&B Natural Resources as an "affiliate."[68] That website also states that the Galesi Group alone employed 150 employees.[69]

87. If E&B Natural Resources had counted its affiliate the Galesi Group's 150 employees, then E&B Natural Resources would have listed 407 employees in its SBA Form 2483-SD rather than 257 employees.

**3. Evidence from the PPP Loan Applications from Defendant's Affiliates**

88. On or about April 13, 2020, certain affiliates of E&B Natural Resources applied for First Draw PPP loans and reported the following number of employees:

a. Distribution Unlimited, Inc. reported 69 employees;

b. Rotterdam Ventures, Inc. reported 58 employees;

c. Northeastern Industrial Park, Inc. reported 20 employees; and

d. Excalibur Well Services Corporation reported 157 employees.

89. Excalibur Well Services Corporation also reported 99 employees on its Second Draw PPP loan application.

---

[67] Form 5500, Notes to Financial Statements at 5 (2021).
[68] Galesi Group, Affiliates, https://www.galesi.com/affiliates/.
[69] Galesi Group, https://www.galesi.com/.

90. E&B Natural Resources reported 257 employees in its SBA Form 2483-SD. If E&B Natural Resources had counted the employees of just four affiliates—Distribution Unlimited, Inc., Rotterdam Ventures, Inc., Northeastern Industrial Park, Inc., and Excalibur Well Services Corporation —it would have reported well over 300 employees.

91. Even counting only a single affiliate—Excalibur—Defendant exceeded the limit. Defendant's 257 reported employees, combined with the 99 employees Excalibur reported on its Second Draw loan application—total 356 employees, well over 300.

### E. DEFENDANT'S *SCIENTER*

92. Defendant's false statements and certifications were made "knowingly" because they were made either "in deliberate ignorance of the truth or falsity of the information" Defendant provided in its SBA Form 2483-SD or else were made "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A) (defining "knowingly").

93. "Reckless disregard of the truth" is proven "where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted." *United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008) (quoting from Senate Report No. 99–345, at 7 & 20-21 (1986), *as reprinted in* 1986 U.S.C.C.A.N. 5266, 5286).

#### 1. *Scienter* of the Person Who Signed the Loan Application

94. Relator does not (yet) know the identity of the "authorized representative" of Defendant who signed the SBA Form 2483-SD. But the "identity of the natural person within the corporate defendant who submitted false claims is not an essential element of a FCA violation." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 506 (6th Cir. 2007); *see also U.S. ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015) ("identifying precisely who pulled" the "corporate levers" "is not an inexorable requirement of Rule 9(b) in all cases").

95. Defendant knows full well who signed the loan application form.

96. The signatory signed the form in the course of the signatory's employment by Defendant and for the purpose of benefiting Defendant.

97. The signatory was authorized by Defendant to sign the form.

98. Defendant is therefore bound by the signatory's attestations and certifications, regardless of the signatory's specific job title, job responsibilities, and authority. *Grand Union Co.*

*v. United States*, 696 F.2d 888, 891 (11th Cir. 1983) ("a corporation will be liable for violations of the False Claims Act if its employees were acting within the scope of their authority and for the purpose of benefiting the corporation").

99. The signatory, by his or her signature, "certif[ied] that the information provided in this application . . . is true and accurate," and acknowledged "that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000 . . . ."

100. The signatory, by his or her signature, certified that he or she had "read" the Second Draw PPP loan application instructions, "the Statements Required by Law and Executive Orders," and "the rules in effect at the time this application is submitted," and that "I understand them."

101. The signatory, by his or her signature, certified that E&B Natural Resources was "eligible to receive a loan under the rules in effect at the time this application is submitted."

102. Numerous easily available sources of guidance, from the SBA, made crystal clear that "the rules in effect at the time" the application was submitted required E&B Natural Resources Corporation to apply the affiliation rules set forth in 13 C.F.R. 121.301(f). Even the most "simple inquir[y]," *Bourseau*, 531 F.3d at 1168, would have alerted the signatory to the need to apply the affiliation rules in 13 C.F.R. 121.301(f).

103. On January 14, 2021, the SBA and Treasury published a consolidated Interim Final Rule governing PPP loan eligibility, including affiliation requirements.[70] That consolidated Interim Final Rule, like the ones before it, directed applicants to include their affiliates and referred applicants to 13 C.F.R. 121.301(f). It stated:

**3. Affiliation Rules Generally**

*a. Are affiliates considered together for purposes of determining eligibility?*

> In most cases, a borrower will be considered together with its affiliates for purposes of determining eligibility for the PPP. Under SBA rules, entities may be considered affiliates based on factors including but not limited to

[70] Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by Economic Aid Act, 86 Fed. Reg. 3692 (Jan. 14, 2021).

stock ownership, overlapping management, and identity of interest. See 13 CFR 121.301(f).

104. The SBA's FAQ Number 5—which was prominently posted on the SBA's website, and had been posted there since April 2020—informed applicants that they were "required to apply SBA's affiliation rules under 13 C.F.R. 121.301(f)."[71]

105. Since April 3, 2020, the SBA maintained on its website a two-page, user-friendly document entitled "AFFILIATION RULES APPLICABLE TO U.S. SMALL BUSINESS ADMINISTRATION PAYCHECK PROTECTION PROGRAM."[72] It restated the affiliation rules set forth in 13 C.F.R. § 121.301(f). The first three sentences of this document stated, in bold text: "**Four tests for affiliation based on control apply to participants in the Paycheck Protection Program. [footnote 1: 13 C.F.R. 121.301(f)] For purposes of the [*sic*] determining the number of employees of an applicant to the Paycheck Protection Program, the applicant is considered together with its affiliates. Following is a summary of the applicable affiliation tests.**"

106. In addition to these prominently posted rules, the SBA Form 2483-SD itself also alerted the signatory of the need to include E&B Natural Resource's affiliates.

107. The signatory, by his or her signature, certified that "[t]he Applicant, *together with its affiliates (if applicable)* . . . employs no more than 300 employees." (Emphasis added.)

108. The signatory, by his or her signature, certified that E&B Natural Resources' "Number of Employees *(including affiliates, if applicable)* . . . ." was "257." (Emphasis added.)

109. Either the signatory obtained and reviewed the SBA's affiliation rules—13 C.F.R. 121.301(f)—or else the signatory acted in reckless disregard of the truth by not doing so.

110. That regulation expressly instructed that "In determining the concern's size, SBA counts the … employees … of the concern whose size is at issue *and all of its domestic and foreign*

[71] SMALL BUSINESS ADMINISTRATION, FAQ for PPP Borrowers and Lenders, at 3, https://www.sba.gov/document/support-faq-ppp-borrowers-lenders.

[72] The document is available on the U.S. Treasury's website, archiving PPP-related instructions and disclosures. U.S. Dep't of the Treasury, *Paycheck Protection Program* (last accessed July 13, 2026), https://home.treasury.gov/policy-issues/coronavirus/assistance-for-small-businesses/paycheck-protection-program (click on link entitled "Applicable Affiliation Rules"). Although the Treasury website does not include a "posted" date for this document, the document itself says "April 3, 2020" in its upper left-hand corner.

*affiliates*, regardless of whether the affiliates are organized for profit." 13 C.F.R. 121.301(f)(6) (emphasis added).

111. That regulation also stated that "Affiliation arises where the CEO or President of the applicant concern . . . also controls the management of one or more other concerns." 13 C.F.R. § 121.301(f)(3).[73]

112. The signatory could have determined, with a "simple inquiry," that Defendant's CEO and President, Stephen Layton, was also the CEO and President of Excalibur Wells. Either the signatory performed that inquiry or else the signatory acted in reckless disregard of the truth by not doing so.

113. 13 C.F.R. 121.301(f) also stated that "Concerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both. It does not matter whether control is exercised, so long as the power to control exists."

114. The signatory could have determined, with a "simple inquiry," that Galesi Group and David Buicko controlled or had the power to control E&B Natural Resources.

115. The signatory also could have determined, with a "simple inquiry," that Galesi Group and David Buicko controlled or had the power to control numerous other entities, and that therefore those other entities were "affiliates of" E&B Natural Resources because Galesi Group and Buicko "control[led] or [had] the power to control both." 13 C.F.R. § 121.301(f).

116. Either the signatory performed these inquiries and learned of the other affiliates, or else the signatory acted in reckless disregard of the truth by not doing so.

117. The signatory could have determined—with a "simple inquiry" to Layton, Buicko, or the Galesi Group—that E&B Natural Resources' affiliates together employed *hundreds* of employees, such that the combined employee count vastly exceeded the 300-employee limit set by the SBA's rules and by the SBA Form 2483-SD itself.

118. The signatory therefore acted in reckless disregard of the truth by certifying, on behalf of E&B Natural Resources, that "[t]he Applicant, *together with its affiliates (if*

[73] 13 C.F.R. § 121.301(f) (effective March 27, 2020 to September 7, 2021).

*applicable)* . . . employs no more than 300 employees," that E&B Natural Resources' "Number of Employees *(including affiliates, if applicable)* . . . ." was "257," and that E&B Natural Resources was "eligible to receive a loan under the rules in effect at the time this application is submitted." (All emphases added.)

**2. *Scienter* of Steven Layton and David Buicko**

119. Defendant's CEO and President, Steven Layton, also acted with *scienter* in connection with Defendant's false statements. *See United States v. Uhler*, No. 2:23-CV-00499-CAS-MBKX, 2025 WL 4350115, at *9 (C.D. Cal. Oct. 6, 2025) (relator's complaint satisfied "the general pleading standard for scienter" by alleging that loan applicant's "executive managers and administrators" "knew and understood the applicable requirements to receive PPP loans" and "knew that [applicant] was ineligible for a loan").

120. Upon information and belief, Layton directed and supervised the submission of Defendant's SBA Form 2483-SD, including the stated employee count of "257" and the certifications of eligibility.

121. The allegation that Layton directed and supervised the submission of the SBA Form 2483-D is based on Mr. Layton's public statements at the time. In 2020, Mr. Layton was both President of Defendant and Chairman of the California Independent Petroleum Association ("CIPA"). Writing in his dual capacity as "CIPA Chairman" and "President of E&B Natural Resources," in CIPA's 2020 Annual Report, Mr. Layton stated that he was "fighting for producers – particularly small and medium sized businesses – to have access to relief programs."[74] The same report also indicates that the organization for which he was Chairman "provided essential guidance and resources for small businesses to apply for the Paycheck Protection Plan."[75] Mr. Layton thus was personally focused on access to federal COVID-19 relief programs, including the PPP, and on the eligibility of "small and medium sized businesses" for those programs, at the same time Defendant was applying for and obtaining its PPP loans.

[74] CIPA Annual Report at 3, June 2020, available at https://www.cipa.org/files/CIPA_2020_Annual_Report_FINAL_06_08_20.pdf#:~:text=fighting%20for%20producers%20%E2%80%93%20particularly%20small%20and%20medium%20sized%20businesses%20%E2%80%93%20to%20have%20access%20to%20relief%20programs

[75] *Id.* at 6.

122. Based on his involvement "fighting for producers . . . to have access to relief programs" and his access to "essential guidance and resources for small businesses to apply for the Paycheck Protection Plan," Mr. Layton knew and understood the applicable requirements to receive a Second Draw PPP loan.

123. Mr. Layton also knew that Defendant and its affiliates employed more than 300 persons. As President of Defendant and as the "plan administrator" of Defendant's 401(k) Plan, Mr. Layton personally signed the Plan's Forms 5500 for 2019 and 2020—both before Defendant submitted its SBA Form 2483-SD—reporting 407 and 427 active participants (2019) and 435 and 356 active participants (2020). Each of those filings attached an auditor's report stating that the Plan covered employees of Defendant "and certain affiliated companies." Mr. Layton thus had knowledge, at the time Defendant certified under his supervision that Defendant and its affiliates had only 257 employees, that Defendant and its affiliates had more than 300 employees participating in a single Plan, and that Defendant had affiliates whose employees had to be counted.

124. Mr. Layton's knowledge of Defendant's affiliates was also direct and personal. As the CEO and President of both Defendant and Excalibur, Mr. Layton controlled the management of both companies at the time each applied for its Second Draw PPP loan. Upon information and belief, Mr. Layton was closely involved in both companies' Second Draw PPP loan applications. Defendant reported 257 employees on its Second Draw PPP loan application, and Excalibur reported 99 employees on its own Second Draw PPP loan application—356 employees combined, well over the 300-employee limit. At a minimum, as the chief executive of Excalibur, Mr. Layton was aware of Excalibur's workforce when Defendant's SBA Form 2483-SD was prepared and submitted under his direction and supervision, and he therefore knew, or recklessly disregarded, that Defendant's statement that it and its affiliates had only 257 employees was false.

125. David M. Buicko was a director of Defendant at the time of the application's submission. He also had the requisite *scienter.*

126. At the same time, Buicko was the CEO of the Galesi Group, which owns Defendant. Buicko also personally managed or directed each of the affiliated entities listed in ¶ 58, *supra*. Several of those affiliates, including Distribution Unlimited, Inc., Rotterdam Ventures, Inc., Northeastern Industrial Park, Inc., and Excalibur Well Services Corporation, had themselves

applied for PPP loans and reported their own employee counts, which together with Defendant's exceeded 300.

127. The knowledge of Messrs. Layton and Buicko is imputed to Defendant. *Uhler*, 2025 WL 4350115, at *9.

128. Messrs. Layton and Buicko acted in reckless disregard of the truth by allowing the signatory to certify, on behalf of E&B Natural Resources, that "[t]he Applicant, *together with its affiliates (if applicable)* . . . employs no more than 300 employees," that E&B Natural Resources' "Number of Employees *(including affiliates, if applicable)* . . . ." was "257," and that E&B Natural Resources was "eligible to receive a loan under the rules in effect at the time this application is submitted." (All emphases added.)

**3. *Scienter* of E&B Natural Resources (Collective Knowledge)**

129. Even if no one individual, considered alone, had the requisite *scienter*, Defendant as a corporation necessarily had the requisite *scienter.*

130. The FCA does not require relator to plead or to prove that a "single actor" within the corporate defendant has the requisite *scienter*. *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 919 (4th Cir. 2003) ("[W]e decline to adopt Westinghouse's view that a single employee must know both the wrongful conduct and the certification requirement. If we established such a rule, corporations would establish segregated 'certifying' offices that did nothing more than execute government contract certifications, thereby immunizing themselves against FCA liability."); *see also Grand Union*, 696 F.2d at 891 (FCA *scienter* requirement, when applied to a corporate defendant, does not require plaintiff to prove that the employee making the certifications acted with *scienter*).

131. E&B Natural Resources knew that Layton was its CEO and President.

132. With a "simple inquiry," E&B Natural Resources could have discovered that Layton was also the CEO and President of Excalibur Wells.

133. With a "simple inquiry," E&B Natural Resources could have discovered that Excalibur Wells employed 99 people.

134. E&B Natural Resources knew that Galesi Group and David Buicko controlled or had the power to control it.

135. With a "simple inquiry," E&B Natural Resources could have discovered that Galesi Group and David Buicko controlled or had the power to numerous other entities.

136. With a "simple inquiry," E&B Natural Resources could have discovered that those other entities together employed *hundreds* of employees, such that the combined employee total vastly exceeded the 300-employee limit set by the SBA's rules and by the SBA Form 2483-SD itself.

137. E&B Natural Resources therefore acted in reckless disregard of the truth by certifying that "[t]he Applicant, *together with its affiliates (if applicable)* . . . employs no more than 300 employees," that its "Number of Employees *(including affiliates, if applicable)* . . . ." was "257," and that it was "eligible to receive a loan under the rules in effect at the time this application is submitted." (All emphases added.)

**FIRST CAUSE OF ACTION**

**Submitting False Claims for Payment**

**31 U.S.C. § 3729(a)(1)(A)**

138. Relator repeats, realleges, and incorporates the allegations set forth in the paragraphs above as though fully set forth herein.

139. Defendant violated 31 U.S.C. § 3729(a)(1)(A) by knowingly presenting and/or causing to be presented to the lender a claim for approval of a Second Draw PPP loan.

140. Defendant's knowingly false claim on its SBA Form 2483-SD was material to the lender's decision to issue the Second Draw PPP loan and was material to the SBA's decision to forgive that loan and repay the lender.

141. But for Defendant's knowingly false claim, the lender would not have issued the loan and the SBA would not have forgiven it.

142. The Second Draw PPP loan that Defendant obtained was money that was intended by the Government to be spent or used to advance the Government's program and interest in assisting qualified and eligible small businesses to survive the COVID-19 epidemic and to continue to employ their workers.

143. The Second Draw PPP loan that Defendant obtained was money that the Government effectively and in practice provided to the lender, by means of the Government's 100% guarantee to the lender of repayment by the Government in the case of default by the borrower.

144. The Government later reimbursed the lender 100% of the amount of Defendant's Second Draw PPP loan, with interest.

**SECOND CAUSE OF ACTION**

**Creating a False Record or Statement Material to a False Claim**

**31 U.S.C. § 3729(a)(1)(B)**

145. Relator repeats, realleges, and incorporates the allegations set forth in the paragraphs above as though fully set forth herein.

146. Defendant violated 31 U.S.C. § 3729(a)(1)(B) by knowingly making or causing to be made a false record and statement—namely, its SBA Form 2483-SD and its included certifications—to support a false claim submitted to the lender for approval of Second Draw PPP loan.

147. Defendant's knowingly false record and statement was material to the lender's decision to issue the Second Draw PPP loan and was material to the SBA's decision to forgive that loan and repay the lender.

148. But for Defendant's knowingly false record and statement, the lender would not have issued the loan and the SBA would not have forgiven it.

**THIRD CAUSE OF ACTION**

**Improperly Avoiding an Obligation to Pay or Transmit Money**

**31 U.S.C. § 3729(a)(1)(G)**

149. Relator repeats, realleges, and incorporates the allegations set forth in the paragraphs above as though fully set forth herein.

150. Defendant violated 31 U.S.C. § 3729(a)(1)(G) by knowingly and improperly avoiding Defendant's obligation to repay its Second Draw PPP loan. After obtaining the Second Draw PPP loan, and while knowing that it and its affiliates had more than 300 employees and that it was therefore ineligible for the loan, Defendant had an established duty to repay the loan. Rather than return the money, Defendant affirmatively sought and obtained forgiveness, thereby

fraudulently reducing and avoiding—and in fact eliminating—the full $2,020,777.78 it owed, which the Government then paid to PNC Bank in Defendant's place.

151. The term "obligation" means "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

152. Defendant's first "obligation" arose from its lending contract with the lender, PNC Bank. That contract required Defendant to repay the loan to PNC Bank. PNC Bank was delegated authority to act in the Government's place in providing the loan. *See* 15 U.S.C. § 636(F)(ii). The Government was the loan's guarantor and the Government later paid the full loan amount, plus interest and processing fees, to PNC Bank after the loan was forgiven.

153. Because Defendant was ineligible to receive the loan in the first place, Defendant was also ineligible to have its loan forgiven. *See* 15 U.S.C. § 637(J)(ii) (only an "eligible entity shall be eligible for forgiveness"); *see also* Business Loan Program Temporary Changes; Paycheck Protection Program—Requirements—Loan Forgiveness, 85 Fed. Reg. 33,004, at 33,005 (June 1, 2020) (if "the borrower was ineligible for the PPP loan based on the provisions of the CARES Act, SBA rules or guidance available at the time of the borrower's loan application, or the terms of the borrower's PPP loan application (for example, because the borrower lacked an adequate basis for the certifications that it made in its PPP loan application), the loan will not be eligible for loan forgiveness"); SBA Procedural Notice No. 5000-20078, at 2 (Jan. 15, 2021) (if "a borrower was ineligible for any portion of its loan amount, forgiveness will be denied for the ineligible portion").[76]

154. In order to obtain forgiveness, Defendant submitted a Forgiveness Application to PNC Bank.[77] PNC Bank and the Government relied on that application in determining to forgive the loan. By submitting a Forgiveness Application, Defendant implicitly certified that Defendant

---

[76] https://home.treasury.gov/system/files/136/PPP--Procedural-Notice--PPP-Excess-Loan-Amount-Errors.pdf

[77] https://www.sba.gov/sites/default/files/2021-07/PPP%20--%20Forgiveness%20Application%20and%20Instructions%20--%203508%20%287.30.2021%29-508.pdf

was eligible for the Second Draw PPP loan in the first place. That certification was false because Defendant was ineligible. Thus, Defendant's Forgiveness Application was a separate false record and statement, made in 2021 or 2022 after Defendant had already received the loan proceeds.

155. By submitting the Forgiveness Application to PNC Bank, Defendant knowingly and improperly avoided Defendant's obligation to repay the loan.

156. In addition to Defendant's "obligation" set forth in its loan contract with PNC Bank, Defendant also has an "obligation" to repay the value of the loan to the SBA because both the loan and the loan's subsequent forgiveness constitute an "overpayment" to Defendant. 31 U.S.C. § 3729(b)(3) (defining "obligation" to include "an established duty … arising from … retention of any overpayment"). The loan is an "overpayment" because Defendant was not eligible to receive it. *See* 31 U.S.C.A. § 3351(4) (an "overpayment" is an "improper payment" including "any payment to an ineligible recipient"); *id.* (5) ("payment" includes "any transfer or commitment for future transfer of Federal funds such as … loan guarantees").

157. Defendant has continued to retain the forgiven loan proceeds and has never repaid them, despite knowing that it was ineligible for the loan and for forgiveness, and thus has knowingly concealed and improperly avoided its obligation to return the overpayment to the Government.

## PRAYER FOR RELIEF

**WHEREFORE**, Relator requests judgment against Defendant for: (i) three times the amount of damages that the United States has sustained (including the full amount of the forgiven Second Draw PPP loan and interest thereon, plus all processing fees paid by the Government); (ii) the maximum civil penalties allowed by law; (iii) an award to Relator for the maximum allowed under 31 U.S.C. § 3730(d); (iv) an award of attorney's fees, costs, and expenses; (v) interest as provided by law; and (vi) any other relief that this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: October 16, 2026

**SUSMAN GODFREY L.L.P.**

By: */s/ Oleg Elkhunovich*

Oleg Elkhunovich (269238)
oelkhunovich@SusmanGodfrey.com
**SUSMAN GODFREY L.L.P.**
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

Steven M. Shepard (admitted *pro hac vice*)
Amy B. Gregory (admitted *pro hac vice*)
Shauli Bar-On (356650)
**SUSMAN GODFREY L.L.P.**
One Manhattan West, 50th Floor
New York, NY 10001
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
sshepard@susmangodfrey.com
agregory@susmangodfrey.com
sbar-on@susmangodfrey.com

*Attorneys for Relator Verity Investigations, LLC*